**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 23 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

  Plaintiff-Appellee,

v.                                                    No. 97-6067

CHARLES LEE TRUJILLO,

  Defendant-Appellant.

---

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. CR-96-130-A)**

---

Edward J. Kumiega (Patrick M. Ryan, United States Attorney, with him on the brief), Assistant United States Attorney, Oklahoma City, Oklahoma, for Plaintiff-Appellee.

Susan L. Foreman (Michael G. Katz, Federal Public Defender, with her on the brief), Assistant Federal Public Defender, Denver, Colorado, for Defendant-Appellant.

---

Before **PORFILIO, BRORBY** and **MURPHY**, Circuit Judges.

---

**BRORBY**, Circuit Judge.

---

Defendant, Mr. Charles Trujillo, timely appeals his conviction in Oklahoma federal district court of armed bank robbery, carrying a firearm in relation to a crime of violence, and felon in possession of a firearm. He further appeals the $7,500 fine the district court imposed at sentencing. For the reasons set forth below, we affirm both his conviction and the fine.

## I. FACTS

On October 23, 1991, the Del City branch of the Bank of Oklahoma was robbed of $7550. A man wearing a hard plastic mask that covered his head and holding a small semiautomatic handgun entered the bank shortly after 9:00 a.m. After walking behind the teller counter, holding the handgun at waist level and parallel to the floor, the robber told Customer Service Representative Marilyn Hendricks, and bank teller Brenda Lilly, to place money in a cloth bag he provided. Ms. Hendricks complied with his demand. The robber then moved to another teller station; when the teller tried to give him bait money, he fled through the front door.

Ms. Hendricks described the robber as wearing a blue jacket, jeans and a hard transparent mask. She saw hair coming down across the nape of the robber's neck and his skin tone. She testified he was Native American. Ms. Hendricks

further testified that while she could not see any clear facial features, the robber was clean shaven. He was approximately 5'11" tall and weighed 200-250 pounds.

Ms. Lilly described the robber as a white male, approximately 6'1" tall and weighing 250 pounds. She testified the robber was wearing a blue windbreaker and jeans, and may have been wearing layers of clothing beneath his jacket that made him appear larger. Although she could not recall if the robber had facial hair, Ms. Lilly testified she could not see a full beard pushing against the mask, which was close to the skin of the face.

Bank customer Thurman Whitt realized what had happened when he heard a scream and saw someone getting into a mini-van with a bag in his hand. Mr. Whitt then left the bank and followed the mini-van in his pickup. After losing sight of the mini-van for a moment, he saw it pull into an apartment complex. When Mr. Whitt drove into the complex, he found the mini-van parked with no one inside. However, he saw a man run across from the van and into a maroon or red Oldsmobile with a missing left rear hubcap. Mr. Whitt described the man entering the Oldsmobile as white, with olive skin. He wore a tan jacket, no mask, and was clean shaven. Mr. Whitt followed the Oldsmobile through the apartment complex, out onto a four-lane highway and through a Circle K. Mr. Whitt got

-3-

within 50 to 100 feet of the Oldsmobile; however, because the cars were moving back and forth, he was unable to get the license tag number. Ultimately, Mr. Whitt lost sight of the Oldsmobile, flagged down a Del City police officer, and took the officer to the mini-van at the apartment complex.

The mini-van was traced to Toyah Braun, Mr. Trujillo's ex-wife. After their divorce, Ms. Braun kept the mini-van and Mr. Trujillo kept a 1982, brownish-red Oldsmobile with missing hubcaps. Mr. Trujillo still had keys to the mini-van, however. On the morning of the robbery, Ms. Braun discovered her mini-van missing from her residence. She telephoned Mr. Trujillo, who denied taking it. She then reported the van stolen. Ms. Braun described Mr. Trujillo as Mexican and a quarter Indian, 5'8" tall and weighing 165 pounds.

The Federal Bureau of Investigation ("FBI") focused its investigation on Mr. Trujillo and Donald Ladd, a friend of Mr. Trujillo's who was already under FBI surveillance as a suspected bank robber.[1] On October 28, 1991, the FBI obtained search warrants for (1) Mr. Trujillo's apartment, (2) Mr. Trujillo's 1982

---

[1] Mr. Ladd ultimately was eliminated as a suspect in the bank robbery because he was too tall and because this particular robbery did not fit his *modus operandi*.

Oldsmobile, and (3) Mr. Ladd's residence. In Mr. Trujillo's apartment the agents found a sealed box that contained a sealed envelope, a long duster coat, a toy gun and holster, a bank bag, and a cloth bag. The sealed envelope contained six newspaper clippings pertaining to Oklahoma bank robberies. Both Mr. Trujillo and Mr. Ladd agreed the items in the box belonged to Mr. Ladd; he had put the items in the box, sealed the box and given it to Mr. Trujillo to keep because he knew he was under surveillance. Upon searching Mr. Trujillo's Oldsmobile, the agents found a brown leather jacket on the back seat and a blue nylon jacket and plastic garbage bag with nine knit caps in the trunk. The agents also located a paper bag containing $5,053 hidden in the trunk's tire well.

The FBI first interviewed Mr. Trujillo in January 1992. After voluntarily appearing and signing a waiver of his Miranda rights, Mr. Trujillo stated he did not go to work on the day of the robbery; instead, he slept until about 10:00 a.m. Mr. Trujillo said the Oldsmobile was parked outside his apartment during the time of the robbery, but acknowledged the mini-van belonging to his ex-wife and his personal vehicle were used in the robbery. Mr. Trujillo insinuated Mr. Ladd may have taken both vehicles as he had access to them and could have made car keys. Mr. Trujillo denied any knowledge of the cash found in the Oldsmobile and stated the money was not his. Mr. Trujillo did, however, admit borrowing a .25 caliber

automatic handgun from a friend and co-worker several days prior to the bank robbery. He said he returned the gun the day after the bank robbery and explained he borrowed the gun because he was contemplating suicide. Mr. Trujillo further acknowledged he purchased a money order in the amount of $400 the day after the robbery. He said he paid for the money order in cash from his paycheck, which had been issued on October 15, 1991. Mr. Trujillo went on to say he was unaware of any robberies perpetrated by Mr. Ladd, and he had no knowledge of a Halloween mask possessed by Mr. Ladd.

Mr. Trujillo terminated the interview after Agent Fitzpatrick informed him FBI surveillance had seen him riding on the back of Mr. Ladd's motorcycle at 9:34 a.m. on the morning of the bank robbery. According to Agent Fitzpatrick, Mr. Trujillo became visibly shaken and stated, "I think I've said enough."

Over four years later, on August 6, 1996, a grand jury returned a three-count indictment charging Mr. Trujillo with bank robbery, using a firearm during a crime of violence, and felon in possession of a firearm. Mr. Trujillo was arrested in Grand Junction, Colorado, on August 8, 1996.

Mr. Ladd, in the meantime, had been arrested and was serving an eight-year

sentence for a 1992 armed robbery in Arkansas. In January 1996, a grand jury from the Western District of Oklahoma indicted Mr. Ladd on eleven counts related to bank robbery and firearm violations. However, that indictment did not include the Del City robbery. In exchange for his guilty plea to one count of conspiracy to commit bank robbery and his agreement to provide testimony, the indictment was dismissed and Mr. Ladd was sentenced to forty-six months imprisonment to run consecutively with his Arkansas sentence. If found guilty of all the charges in the indictment, Mr. Ladd might have faced sixty to seventy years incarceration.

In the course of his testimony against Mr. Trujillo, Mr. Ladd stated he told Mr. Trujillo about his bank robbery exploits when he and Mr. Trujillo became friends in 1991. More specifically, he explained to Mr. Trujillo how he would steal a car, get a mask, go over or behind the counter, and wear loose clothing so the witnesses could not accurately approximate his size. Mr. Ladd further testified that at about 9:30 a.m. on the morning of the Del City bank robbery, Mr. Trujillo came to his house and asked for a ride. Mr. Trujillo told Mr. Ladd he had been driving his ex-wife's mini-van and it had broken down. Mr. Ladd took Mr. Trujillo to a Del City apartment complex on his motorcycle.

According to Mr. Ladd, when the two arrived at the apartment complex they saw four police cars. Mr. Trujillo said "go" and Mr. Ladd drove back to his house. On their way back, Mr. Trujillo told Mr. Ladd he robbed the bank in Del City and thought he could get the mini-van before the police found it. Mr. Trujillo later told Mr. Ladd he had been chased by a small pickup and burned the mask and jacket. Mr. Trujillo claimed to have taken around $5,000 from the Del City bank.

Mr. Ladd testified that on October 27, 1991, he had spent the night at Mr. Trujillo's apartment and was using Mr. Trujillo's Oldsmobile to run errands on the morning of October 28, just prior to the FBI's search of the Oldsmobile. However, he denied ever having his own keys to the Oldsmobile. When Mr. Ladd drove the Oldsmobile up to his house, he saw the police. His friend and accomplice, Jeff Brown, was just leaving. Mr. Ladd told Mr. Brown to follow him. They drove to a nearby shopping center, where Mr. Ladd abandoned the Oldsmobile and rode off with Mr. Brown. Mr. Ladd testified if he had known about the cash located in the trunk of the Oldsmobile he would have taken it.

When questioned about his *modus operandi*, Mr. Ladd testified he would steal a car, but never from a person he knew. After the robbery he would switch

-8-

to another stolen car or his motorcycle, but he would never go back to where he switched cars.  He stated he wore a mask and a long coat, and typically entered through the bank doors about 9:00 a.m.  Mr. Ladd described himself as 6' tall and weighing 220 pounds.

A jury convicted Mr. Trujillo of armed bank robbery and two weapons offenses on October 21, 1996.  The district court sentenced Mr. Trujillo to two concurrent sixty-month terms of imprisonment, plus one consecutive sixty-month term.  In addition, the court ordered five years of supervised release and $2,497 restitution.  Finally, the court imposed a $7,500 fine and special assessments totaling $150.

## II.  ANALYSIS

*Brady Violation*

Mr. Trujillo claims the district court erred by denying his motion for a new trial based upon the Government's failure to disclose material impeachment evidence as required by *Brady v. Maryland*, 373 U.S. 83 (1963).  The Government concedes it failed to turn over to the defense certain FBI 302 reports until after

trial.[2]  The Government also concedes the withheld evidence would have been

favorable to Mr. Trujillo.  Thus, the disputed issue relevant to the claimed *Brady*

violation is whether the suppressed evidence is material.

The parties agree evidence is material "if there is a reasonable probability

that, had the evidence been disclosed to the defense, the result of the proceeding

would have been different.  A 'reasonable probability' is a probability sufficient to

undermine confidence in the outcome" of the proceeding.  *United States v.

Bagley*, 473 U.S. 667, 682 (1985).  Whether the withheld evidence is material or

how it may have affected the verdict presents a mixed question of law and fact we

must review *de novo*.  *Banks v. Reynolds*, 54 F.3d 1508, 1516 (10th Cir. 1995).

The undisclosed FBI 302 reports, in relevant part, revealed Mr. Ladd had

talked with the FBI while he was serving time in Arkansas in 1992.  During the

course of the 1992 interviews, Mr. Ladd denied any involvement in any Oklahoma

City robberies, but stated he knew of an individual who committed four bank

---

[2]  Some of these reports represented transcribed FBI interviews with "an unnamed inmate" who disclosed Mr. Ladd had information concerning bank robberies in Oklahoma City.  Other reports represented transcribed FBI interviews with Mr. Ladd in which he offered to give information to the FBI in exchange for immunity from prosecution.

robberies in Oklahoma City. Mr. Ladd further told the FBI he would provide the information he had concerning the bank robberies and a major drug trafficking operation between Dallas, Texas and Oklahoma City if the FBI would recommend a reduction of his eight year sentence. It was only later, when it became clear he could not avoid all the Oklahoma robbery charges, that Mr. Ladd admitted his own culpability and agreed to plead guilty to one count of conspiracy to commit bank robbery. He leveraged his plea agreement with the promise to testify against Mr. Trujillo regarding the one bank robbery the FBI did not suspect Ladd of committing. Mr. Trujillo argues this undisclosed evidence concerning Mr. Ladd's 1992 interviews was material because he could have used it to (1) impeach Mr. Ladd with his prior inconsistent statements concerning his own culpability; (2) further demonstrate to the jury Mr. Ladd is "the kind of person who would implicate anyone, including a friend, regardless of the truthfulness of his statements if it would benefit him"; and (3) undermine the government's argument to the jury that Mr. Ladd had no reason to lie. According to Mr. Trujillo, this is particularly true because "[w]ithout [Mr.] Ladd, the government did not have a provable case."

Impeachment evidence certainly falls within the *Brady* rule. *Bagley*, 473 U.S. at 676. However, the failure to disclose impeachment evidence does not

require automatic reversal, even where, as here, the prosecution's case depends largely on the credibility of a particular witness. *Id.* at 676-77; *Giglio v. United States*, 405 U.S. 150, 154 (1972). The court still must find the evidence material. *Giglio*, 405 U.S. at 154. We agree with the district court the undisclosed impeachment evidence in this case fails to meet the materiality standard.

Mr. Ladd testified on direct examination he had three prior felony convictions and was testifying against Mr. Trujillo as a result of a plea agreement involving Oklahoma bank robbery charges. He further admitted to using cocaine and being a car thief. The fruit of the defense's cross-examination included additional details regarding the Oklahoma bank robbery charges against Mr. Ladd and the benefit to Mr. Ladd of his plea agreement if he testified against Mr. Trujillo. We agree with the district court the undisclosed impeachment evidence was cumulative to Mr. Ladd's testimony on direct and cross-examination, and thus would have provided only marginal additional support for Mr. Trujillo's defense. *See United States v. Page*, 808 F.2d 723, 730 (10th Cir.), *cert. denied*, 808 F.2d 723 (1987); *United States v. Derr*, 990 F.2d 1330, 1336 (D.C.Cir. 1993) (an incremental amount of impeachment evidence on an already compromised witness does not amount to material evidence).

Mr. Trujillo argues the impeachment value of the undisclosed evidence is of a different type and magnitude than that presented at trial because it contained statements inconsistent with Mr. Ladd's trial testimony and went beyond the potential motive and bias implicit in Mr. Ladd's plea agreement. We disagree. While we acknowledge there may be a difference in the degree to which Mr. Ladd could have been impeached had the FBI 302 reports been made available to the defense, we fail to see any meaningful difference in the type of impeachment evidence available to the defense. The jury was well aware of Mr. Ladd's criminal propensities and motive for testifying that Mr. Trujillo committed the Del City robbery. To the extent the FBI reports revealed prior inconsistent statements, those statements primarily pertained to Mr. Ladd's culpability in a number of robberies, not Mr. Trujillo's culpability in the Del City robbery. For all these reasons, we conclude the information in the undisclosed FBI reports was unlikely to have swayed the jury in Mr. Trujillo's favor. Accordingly, Mr. Trujillo is not entitled to a new trial on *Brady* grounds.

*Newly Discovered Evidence*

Mr. Trujillo further asserts the district court erred when it denied his motion for a new trial based on newly discovered evidence. The new evidence Mr. Trujillo sought to present was the testimony of Mr. Kelly Ray Potter, Jr., a

cell-mate of Mr. Ladd in the Oklahoma County jail. In his affidavit, Mr. Potter stated that while they were in jail together, Mr. Ladd told him that "him [Ladd] and his fall partner a Mexican guy had robbed a [b]ank in Del City." The district court concluded Mr. Potter's testimony was inadmissible hearsay and thus could be used only for impeachment purposes. Because Mr. Ladd was subjected to thorough impeachment at trial, the district court further concluded Mr. Potter's testimony would be cumulative.

We review the district court's decision to deny Mr. Trujillo's new trial motion for an abuse of discretion. *United States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir. 1997). We will reverse that decision only if the district court made a clear error of judgment or exceeded the bounds of permissible choice under the circumstances. *United States v. Messner*, 107 F.3d 1448, 1453 (10th Cir. 1997).

A motion for new trial based on newly discovered evidence is not favorably regarded and "'should be granted only with great caution.'" *United States v. Youngpeter*, 986 F.2d 349, 356 (10th Cir. 1993) (quoting *United States v. Sutton*, 767 F.2d 726, 728 (10th Cir. 1985)). Accordingly, the standard for determining whether a defendant should be granted a new trial based on newly discovered evidence requires the alleged newly discovered evidence be (1) more than

impeaching or cumulative, (2) material to the issues involved, (3) such that it would probably produce an acquittal, and (4) such that it could not have been discovered with reasonable diligence and produced at trial.  *Id*.  We agree with the district court Mr. Potter's testimony fails to satisfy this standard.

Because Mr. Potter's affidavit in no way exculpates Mr. Trujillo, the defendant on trial,  Mr. Potter's testimony is useful only to the extent it tends to impeach Mr. Ladd's denial of any involvement in the Del City bank robbery.  As discussed above, we reject the notion that testimony regarding Mr. Ladd's lack of culpability in the crime charged is somehow different in form from and therefore not cumulative of other impeachment evidence elicited by the defense.  Moreover, we conclude it is highly improbable Mr. Potter's testimony would result in Mr. Trujillo's acquittal.  Under these circumstances, the district court properly denied Mr. Trujillo's motion for a new trial based on newly discovered evidence.

*Hearsay Exceptions/Objections*

Mr. Trujillo challenges three of the district court's hearsay rulings.  First, he argues the district court erroneously excluded two FBI 302 reports that summarized the statements of two witnesses who were present at the apartment complex where the robber switched from the mini-van to the Oldsmobile, but

unavailable at trial.  Second, he claims the district court erred by allowing Agent

Fitzpatrick to testify regarding hearsay descriptions of the bank robber.  Third, he

asserts the district court should have excluded Mr. Ladd's testimony regarding

witnesses' varying descriptions of the perpetrator of the robberies Mr. Ladd had

committed.

We review the district court's evidentiary rulings for an abuse of discretion,

considering the record as a whole.  *United States v. Snow*, 82 F.3d 935, 940 (10th

Cir. 1996).  Because hearsay determinations are particularly fact and case

specific,  we afford heightened deference to the district court when evaluating

hearsay objections.  *United States v. Wilson*, 107 F.3d 774, 780 (10th Cir. 1997);

*Snow*, 82 F.3d at 940.

1.      Eyewitness Statements

Defense counsel twice urged the admission of two FBI 302 reports that

summarized the statements of two witnesses who were present at the apartment

complex where the bank robber switched from the getaway mini-van to the

Oldsmobile.  Of value to the defense was the fact both reports described the

subject as having a full beard.  It is undisputed Mr. Trujillo did not have a beard.

Since the witnesses were unavailable at trial, the two reports summarizing their

statements to the FBI are hearsay. Defense counsel sought admission of the reports pursuant to Fed. R. Evid. 804(b)(5), one of the residual exceptions to the hearsay rule.

In order to fall within the relevant hearsay exception, the FBI reports must: (1) have "equivalent circumstantial guarantees of trustworthiness" to statements covered by the other hearsay exceptions, (2) be offered as evidence of a material fact, (3) be more probative on the point for which it is offered than any other evidence the proponent can procure through reasonable efforts, and (4) serve the general purposes of the rules of evidence and the interest of justice. Fed. R. Evid. 804(b)(5). The district court refused to admit the reports, concluding (1) they were not sufficiently reliable and (2) "it wouldn't be in the interest of justice to permit the use of this type of testimony and deny the government the opportunity to cross-examine these witnesses." The court reasoned, "[i]f the subject [of the FBI 302 report] is a fleeting view of somebody who is inside an automobile, cross-examination is absolutely crucial to permit the jury to evaluate opportunity to observe and validity of the impression." Of additional concern to the court was the known inaccuracy of the FBI 302 report that summarized Ms. Hendricks' eyewitness observations.

Mr. Trujillo claims this ruling denied him a fair trial. He argues the proffered statements "were sufficiently trustworthy because they related to the personal observations of disinterested bystanders, they were recorded by FBI agents briefly after the observations had taken place, and they were corroborated by other evidence." Moreover, according to Mr. Trujillo, it was in the interest of justice to admit the requests because they went to the heart of Mr. Trujillo's defense -- it was Mr. Ladd, who had a full beard, who committed the Del City bank robbery.

"It is intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances." S. Rep. No. 93-1277, at 36 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7051, 7066. Accordingly, the party offering the evidence bears a heavy burden of presenting the trial court with sufficient indicia of trustworthiness to trigger application of Fed. R. Evid. 804(b)(5). *See New England Mut. Life Ins. Co. v. Anderson*, 888 F.2d 646, 650-51 (10th Cir. 1989). When first proffered, defense counsel made no showing concerning the reliability or trustworthiness of the two FBI 302 reports. He simply stated his desire to "extricate" from the reports the fact the descriptions mentioned a beard. Nor did defense counsel elaborate on why the reports were inherently trustworthy when he presented the issue to the court a second time. What the trial court knew at the

time was (1) as compared to Ms. Hendricks and Mr. Whitt, the unavailable witnesses had a limited opportunity to view the robber; (2) one of the proffered reports mistakenly described Mr. Whitt, the retired gentleman who pursued the robber, as in his late twenties; (3) the subject of the second proffered report recalled seeing a maroon colored Dodge mini-van parked at the complex, whereas Mr. Whitt testified the van he followed to the parking lot was blue or greenish-blue; (4) an FBI 302 report inaccurately documented Ms. Hendricks' description of the robber; and (5) defense counsel had challenged the accuracy of an FBI 302 report that documented a conversation between Agent DeWitt and Agent Fitzpatrick.

In sum then, the record reveals no self-evident, particularized guarantees of trustworthiness attributable to the proffered reports. Contrary to Mr. Trujillo's assertion on appeal, the reports were not corroborated in any real sense. Giving appropriate deference to the trial court's ability to weigh these circumstances first hand, we conclude the trial court did not abuse its discretion by excluding the two FBI 302 reports.

2. Agent Fitzpatrick's Testimony

FBI Special Agent Joseph Fitzpatrick was the agent assigned to investigate

the Del City bank robbery. At trial, the prosecution asked Agent Fitzpatrick what type of suspect he was looking for after reviewing the witness interviews and photographs taken during the Del City robbery. Agent Fitzpatrick responded that the witnesses had described the suspect as "somewhere around 200 pounds," "under six foot" and, on "three different occasions," as an "Indian male." After some delay, defense counsel objected to this testimony on hearsay grounds. The district court allowed the testimony, but cautioned the jury it could not consider Agent Fitzpatrick's recount of the witnesses' descriptions as evidence of the truth of those descriptions. Rather, the court instructed that Agent Fitzpatrick's testimony "has to be limited to [the question of what the FBI was looking for] rather than evidence going to the truth of the assertion of description. It only explains what they were doing in the FBI office."

Mr. Trujillo asserts that because "[t]his was an identification case," to the extent Agent Fitzpatrick's testimony related descriptions from witnesses other than those who testified, it was "unfairly prejudicial," and the "court's instruction was confusing and ... insufficient." Mr. Trujillo cites no authority in support of his argument, and we find none. It is clear from the transcript Agent Fitzpatrick's testimony was offered as evidence of the focus of the FBI's investigation, not to prove the truth of some unavailable witnesses' descriptions of the bank robber.

As such, the testimony was not hearsay. *Wilson*, 107 F.3d at 780-81 (statements offered not to prove the truth of the matter asserted, but rather to explain the preparations and steps in the investigation are not hearsay). Moreover, any possible error was cured by the court's clear instruction to the jury to limit its consideration of Agent Fitzpatrick's response to how the FBI was proceeding with its investigation. The district court did not abuse its discretion in admitting Agent Fitzpatrick's testimony.

### 3. Mr. Ladd's Testimony

On redirect examination, the prosecutor asked Mr. Ladd if he had reviewed witnesses' descriptions of the masked bandit who committed the four bank robberies Mr. Ladd was charged with committing. Mr. Ladd responded affirmatively. When asked if those descriptions varied, Mr. Ladd again responded in the affirmative, and explained how he had been described as anywhere from 5'8" to 6'3" tall, weighing anywhere from 165-250 pounds, with different colors of clothing and even orange hair. Defense counsel objected to this testimony on the basis of hearsay. The court overruled the objection "because the very matter in question here is presented as a matter that is not true rather than that which is true."

We are troubled by both the nature of defense counsel's objection and the district court's ruling. The hearsay issue is a close one. On the one hand, if, as the trial judge concluded, the prosecution elicited Mr. Ladd's testimony to prove the falsity or variance of the witnesses' descriptions of Mr. Ladd, Mr. Ladd's statements would not constitute inadmissible hearsay testimony. *See United States v. Krohn*, 573 F.2d 1382, 1385-86 (10th Cir.) (untrue statements admitted to prove the making of the statements, not the truth of the matters asserted, did not constitute hearsay), *cert. denied*, 436 U.S. 949 (1978); *United States v. Adkins*, 741 F.2d 744, 746 (5th Cir. 1984), *cert. denied*, 471 U.S. 1053 (1985). On the other hand, the patent irrelevance of the descriptions of Mr. Ladd to Mr. Trujillo's guilt in the Del City bank robbery suggests the prosecution in fact offered Mr. Ladd's testimony to prove the truth of the assertion that witnesses' were likely to misdepict or at least vary in their depictions of a bank robber, thus leading the jury to believe they should not be concerned with any misdescriptions of Mr. Trujillo. Since hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," Fed. R. Evid. 801, this second scenario presents a potential hearsay problem. We believe the district court could have addressed the evidentiary problem presented by Mr. Ladd's testimony more squarely had defense counsel objected on grounds of foundation or relevance.

We need not elaborate further on this issue, however, because even if we assume the district court's hearsay ruling was erroneous, we conclude any error in the admission of Mr. Ladd's testimony was harmless. "Improper admission of hearsay testimony is not a constitutional error, and as such is considered harmless error unless 'in light of the whole record, [the hearsay] "substantially influenced" the outcome of the trial.'" *United States v. Norman T.*, 129 F.3d 1099, 1106 n.3 (10th Cir. 1997) (quoting *United States v. Tome*, 61 F.3d 1446, 1455 (10th Cir. 1995)), *petition for cert. filed* (U.S. Feb. 5, 1998) (No. 97-7834).

In this case, while Mr. Trujillo's identity as the alleged bank robber was the focal point at trial, we seriously doubt whether any inference the jury may have drawn from Mr. Ladd's testimony concerning the accuracy of eye-witness descriptions had a substantial influence on the outcome of Mr. Trujillo's trial. We note first the jury could have drawn the same inference after listening to Ms. Hendricks', Ms. Lilly's and Mr. Whitt's testimony. Their individual descriptions of the Del City bank robber certainly varied and, considered collectively, bore some degree of inaccuracy. Second, the record contains substantial evidence in addition to the witnesses' descriptions that linked Mr. Trujillo to the Del City bank robbery, not the least of which was his admitted possession of a .25 caliber automatic handgun during the relevant time frame, and the money and other items

seized from the trunk of Mr. Trujillo's Oldsmobile -- an Oldsmobile matching the description of the vehicle Mr. Whitt saw the bank robber enter after abandoning the mini-van in the apartment complex parking lot. After reviewing the record, we harbor no grave doubt whether Mr. Ladd's recount of the witnesses' varying descriptions of him in separate and distinct robberies influenced the outcome of Mr. Trujillo's trial. Accordingly, the error, if any, committed by admitting the challenged testimony does not mandate reversal.

*Punitive Fine*

Mr. Trujillo challenges the $7,500 fine the district court imposed pursuant to 18 U.S.C. § 3572(a). He argues the court could not have satisfied the statutory mandate that it consider the impact of a fine on the defendant's dependents and on the defendant's ability to make restitution when considering whether to impose a fine, because his presentence report (1) disclosed he was in arrears on his child support and installment debt payments and (2) indicated he was incapable of paying both restitution and a fine at the time of sentencing, but that he might be able, over time, to pay restitution *or* a fine. He further argues under such circumstances the statutory scheme gives priority to restitution and "trumps" the guideline provision, U.S.S.G. § 5E1.2(a), that makes a fine presumptively mandatory.

We review the district court's decision to impose a fine for abuse of discretion. *See United States v. Meuli*, 8 F.3d 1481, 1487 (10th Cir. 1993), *cert. denied*, 511 U.S. 1020 (1994). We reject a district court's findings regarding a defendant's ability to pay a fine only if they are clearly erroneous. *United States v. Washington-Williams*, 945 F.2d 325, 326 (10th Cir. 1991).

Here, the presentence report prepared by the probation office disclosed Mr. Trujillo is obliged to pay child support in the amount of $645/month. The presentence report further disclosed Mr. Trujillo is in arrears in his child support payments as well as other installment debt payments. Mr. Trujillo reported no assets to the probation office. Nevertheless, the presentence report demonstrated Mr. Trujillo is capable of working and has a high likelihood of future earnings. Ultimately, the probation office concluded that while his financial circumstances rendered his present ability to pay restitution or a fine "doubtful," Mr. Trujillo "may be capable of paying a fine or making restitution in installment payments." A fair reading of the presentence report does not, as Mr. Trujillo suggests, indicate the probation office concluded he would never be able to pay both a fine and restitution.

Nothing in the record on appeal indicates Mr. Trujillo objected to this

aspect of the presentence report. During the sentencing proceeding, Mr. Trujillo's attorney summarily stated Mr. Trujillo was without assets and therefore unable to pay a fine or restitution. Acknowledging Mr. Trujillo's significant employment record, the court, however, concluded he will have the future capacity to defray the financial consequences of his criminal conduct. Accordingly, the court imposed a fine at the lowest end of the guideline range, in addition to ordering restitution to the Bank of Oklahoma.

It is clear from the record the district court considered Mr. Trujillo's ability to pay both restitution and a fine despite his present lack of assets and parental responsibilities. To the extent Mr. Trujillo is suggesting the court must set forth factual findings specific to each statutory factor prior to imposing a fine, we disagree. This court imposes no such requirement. *See, e.g., United States v. Wright*, 930 F.2d 808, 810 (10th Cir. 1991) (specific fact-finding on the record deemed unnecessary for imposition of fines under 18 U.S.C. § 3622, the precursor to § 3572); *see also United States v. Marquez*, 941 F.2d 60, 65 (2d Cir. 1991). It is sufficient that the record reflects the basis for the imposition of the fine. *Marquez*, 941 F.2d at 65.

Because we conclude the district court satisfied its obligation to consider

the relevant statutory factors, we need not address the proposition that a conflict may exist between the statute and the guidelines, and that the statute should control this case. This record demonstrates no clear error of judgment on the part of the district court. Accordingly, we hold the district court did not abuse its discretion by imposing a $7,500 fine against Mr. Trujillo.

## III. CONCLUSION

Mr. Trujillo asserts he is entitled to relief due to the cumulative effect of trial error. Our precedent is clear, however, "a 'cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect [of non-errors].'" *Brecheen v. Reynolds*, 41 F.3d 1343, 1369 n. 23 (10th Cir. 1994) (quoting *United States v. Rivera,* 900 F.2d 1462, 1471 (10th Cir. 1990)), *cert. denied*, 515 U.S. 1135 (1995). As we have found just one potential trial error, and concluded that error was harmless, Mr. Trujillo's claim of cumulative error is unavailing.

Mr. Trujillo's bank robbery conviction and $7,500 fine stand **AFFIRMED** .