IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 112,372

STATE OF KANSAS,
*Appellee*,

v.

DANE C. DEWEESE,
*Appellant*.

SYLLABUS BY THE COURT

1.

Under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), prosecutors have a positive duty to disclose evidence favorable to the accused when the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

2.

A trial court's determination regarding the existence of a *Brady* violation is reviewed de novo with deference to the trial court's findings of fact. The trial court's denial of a defendant's motion for new trial is reviewed under an abuse of discretion standard.

3.

A court requires three essential elements to establish a *Brady* violation:  (1) The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) that evidence must have been suppressed by the State, either

1

willfully or inadvertently; and (3) that the evidence must be material so as to establish prejudice.

4.

Under the *Brady* test for materiality, evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

5.

When the evidence undisclosed by the prosecution merely reinforces evidence already presented to the jury, the new evidence is considered cumulative and the prosecution's withholding it does not qualify as a *Brady* violation.

Appeal from Saline District Court; JARED B. JOHNSON, judge. Opinion filed January 20, 2017. Affirmed.

*Kurt P. Kerns*, of Ariagno, Kerns, Mank & White, LLC, of Wichita, argued the cause and was on the brief for appellant.

*Ellen H. Mitchell*, county attorney, argued the cause, and *Christina Trocheck*, assistant county attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

NUSS, C.J.: A jury convicted Dane DeWeese of first-degree murder and conspiracy to commit first-degree murder. He appeals the district court's denial of his motion for new trial in which he argued the State failed to disclose a police report to the

defense before trial in violation of its obligation under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

We affirm the district court because we cannot conclude a reasonable probability exists that the trial result would have been different had the State timely disclosed the report for the defense's possible use at trial.

FACTUAL AND PROCEDURAL BACKGROUND

The State prosecuted DeWeese under the theory he and Joel Heil caused Kristen Tyler's death. The State essentially contended DeWeese initiated the events because he believed Tyler stole his money and drugs whereas Heil physically performed the lethal acts in DeWeese's presence. Heil extensively testified against DeWeese as part of a plea bargain with the State.

*Tyler's murder*

The State's witnesses and physical evidence showed that one night Tyler visited her friend Fancy Barboza at Barboza's house in Salina. Tyler brought along Chuck Rowson, Barboza's step-father. Tyler asked if either Rowson or Barboza wanted methamphetamine, and Barboza answered yes. Tyler then allowed Barboza to come with her to get the drugs so long as Barboza promised to stay down in the back seat of the car. Barboza agreed, and the two left her house around 10:30 p.m.

En route, Barboza climbed into the back seat per Tyler's instructions. A short time later, Barboza felt Tyler stop the car. Tyler got out while Barboza remained hidden. Tyler returned 10 to 15 minutes later, put the keys in the ignition, and left again with her cell phone.

3

Barboza waited almost 2 hours, but Tyler never came back. When Barboza finally got out of the car, she saw it was parked by a bank close to DeWeese's house. The bank's video surveillance shows Barboza walking by around 1 a.m.

At around 11 that same night, DeWeese had driven to Heil's house. He was upset and told Heil that money and drugs were missing from his garage and that he believed Tyler was responsible. DeWeese also told Heil that Tyler was currently at DeWeese's house to buy drugs. He wanted Heil's help in retrieving his money and drugs from Tyler, and Heil agreed.

Heil changed clothes while DeWeese called Tyler. DeWeese told Tyler to give her phone to his fiancée, Megan Wells, who was also there. According to Heil, Tyler was not supposed to have a phone in DeWeese's house because "funny stuff" was going on there.

Before Heil left his house, he grabbed a log chain he kept in his kitchen and put it in a drawstring bag. While DeWeese drove them to his house, he told Heil his plan was to pick up Tyler and take her to the country.

Once the two men arrived at DeWeese's house, they asked Tyler if she still wanted drugs. When Tyler said yes, they told her that she would have to go with them to another location to purchase the methamphetamine. Heil's intent was not to go buy drugs but to go beat up Tyler and retrieve DeWeese's money and drugs.

DeWeese, Heil, and Tyler then left DeWeese's house. Heil noted Tyler's car across the street but was not aware Barboza was inside. As DeWeese drove, he slipped Tyler's cell phone—which he had retrieved from Wells—to Heil and told him that Tyler would not be coming back.

4

DeWeese stopped at a gas station—not for gas but for the purpose of getting Tyler on surveillance cameras away from his house. The station's video surveillance showed Tyler entered the store at 11:39 p.m. and left a couple of minutes later.

After they left the station, DeWeese drove into the country. When Tyler asked where they were headed, DeWeese explained they were making the deal in the country so if someone informed the police, they would know that one of the three of them was the informant.

DeWeese stopped the car in a tunnel of an interstate overpass outside of Salina and popped the trunk. He walked to the back of the car, moved to the passenger side, and asked Heil if he was getting out. Heil exited the car, grabbing his chain from the trunk. DeWeese told Tyler to get out, and, when she complied, he asked about his drugs and money. Tyler replied she did not know what he was talking about.

In response to Tyler's repeated denials, Heil swung his log chain and struck her in the head, causing her to fall down and start shaking. DeWeese then kicked Tyler, and Heil attempted to strangle her with the string of his hooded sweatshirt. They continued to beat and drag Tyler around the tunnel for 15 or 20 minutes. When she still made sounds, they dragged her near a fence and pushed her face into the muddy ground with their feet. Heil attempted to cover Tyler with grass while DeWeese picked up several dropped items and drove back and forth to cover any tracks.

Afterward, DeWeese drove Heil back to Heil's house. During the drive, they discussed cleaning DeWeese's car and moving Tyler's car away from DeWeese's house. At this time Heil still had Tyler's cell phone but when it continued to receive calls, DeWeese took it from him. Records showed the phone was last powered on at 1:42 a.m.

5

After arriving at Heil's house, Heil entered without DeWeese. Two neighbors were in the house along with Kimberly French, a juvenile runaway who was his housemate and the girlfriend of his cousin. Heil told the neighbors to leave and walked into his bedroom. After the neighbors left, French followed Heil into his bedroom where he told French that "they had went and killed Kristin" and he was sorry for any involvement he had gotten her in.

Ten minutes after Heil returned, DeWeese entered the house wearing different clothes than he had worn during Tyler's murder. DeWeese carried wet and muddy clothes, and he ordered French to get bags. French complied and grabbed a trash bag from the kitchen.

DeWeese told French to put his wet and muddy clothes, Tyler's sweatshirt, and a tennis shoe in a trash bag. He mentioned checking the clothing for money. When Heil searched the sweatshirt he found money, which DeWeese pocketed. French then received their approval to pour bleach and cleaner in the trash bag. Heil and DeWeese later spent 10 to 15 minutes cleaning DeWeese's car.

Heil and DeWeese then went back into Heil's bedroom and talked about whether French knew too much and if they should move Tyler's car. DeWeese told Heil that French needed to be taken care of, and Heil said that wasn't going to happen. After this discussion, Heil pulled French into the room and told her that he and DeWeese had talked about "tak[ing] care" of her. French testified that DeWeese told her not to say anything, which made her feel scared for her life.

After the men decided to move Tyler's car, DeWeese gave the keys to Heil. Heil eventually drove it to an area across town with DeWeese following. While driving back from leaving Tyler's car, Heil threw the keys individually out of the window.

They returned to DeWeese's house to pick up Wells and the couple's 2-month-old son to take them to the hospital emergency room. After dropping off mother and son, DeWeese took Heil back to Heil's house. Heil testified DeWeese reiterated to him that leaving French alive was a mistake.

Later that day, Heil and French picked up the trash bags containing Heil's and DeWeese's clothes, the log chain, Tyler's sweatshirt, and the tennis shoe, and put them in a dumpster at his grandmother's house. During the next few days, Heil told four other individuals—Angela Helko, Joshua Tucker, Liz Garcia, and his mother—either that Tyler was dead or that he or "we" had killed someone.

Heil was arrested 2 weeks later. That same day Tyler's beaten body was found face down in 6-10 inches of water in a muddy ditch near a tunnel by the interstate.

*Impeachment evidence against Heil*

Heil testified extensively for the State. He admitted that per a plea bargain, he agreed to plead guilty to premeditated first-degree murder in exchange for the State agreeing to later drop murder conspiracy charges and to not seek a hard 50 sentence. Heil also agreed to plead guilty to conspiracy to commit robbery in a separate case—in exchange for dismissal of yet another case involving possession of methamphetamine. According to Heil, the sentences for conspiracy to commit robbery and for homicide would run concurrently. He also stated he would first serve a sentence for a probation violation.

The 25-year-old Heil admitted to starting to use methamphetamine when he was 15 years old. He also admitted to selling drugs. He further testified that meth made him paranoid and violent—"a monster" when using—and that he was high on meth when Tyler was killed.

Heil testified he first met DeWeese approximately 2 months before Tyler's death and admitted their association centered around drugs—primarily meth. He saved DeWeese's name as "Ol' Boy" in his phone contacts. He also testified he had known Tyler since 2010. He admitted that several days before her death he had cut her car tires in retaliation for a friend. When Tyler asked Heil if he had anything to do with that event, he denied it. He also admitted he once had used equipment to check Tyler's car for electronic bugs and expressed his suspicions to other individuals that she was a police informant. Heil also testified that he and DeWeese were paranoid about confidential informants.

According to Heil, 2 days before Tyler's death, they had an altercation about a trip he took to Wichita. Tyler agreed to lend her car so he could pick up drugs and his cousin. In exchange, Heil agreed to give Tyler 1.7 grams of meth worth $170. Before leaving Salina, Heil asked Tyler if she had fixed her car's tag lights. He was worried faulty lights would lead to a police stop—a concern when he also had no driver's license and would be carrying drugs. Tyler confirmed the tag lights were working. After this assurance, Heil left for Wichita with French.

Heil testified that while driving to Wichita, he got a call from Tyler advising him that her tag lights were probably not working. After Heil stopped and discovered this was true, he was "pissed." He suspected that by not having fixed the lights, Tyler might have been setting him up to get pulled over by law enforcement.

8

Heil further testified that when he got to Wichita, he eventually called his sister to pick him up because he refused to drive Tyler's car anymore. He was upset, and he and Tyler yelled at each other on the phone. He told her she would have to pick up her car in Wichita. Heil parked it between two buildings, left $20 in gas money in the front seat, and threw the keys on the floorboard. His sister then drove Heil, French, and a few other individuals back to Salina. They arrived early the morning of the murder.

According to Heil, Tyler came to his house a few hours later—around 6 a.m.—cussing him and asking about the location of her car. He told her it was in Wichita but refused to give the exact location. Tyler left and returned 10 minutes later with Rowson. Heil and Tyler were both mad and cussed at each other. Tyler and Rowson repeatedly asked Heil about her car's location, and Heil repeatedly refused to give a specific Wichita location.

Heil and Tyler continued to argue, and Rowson threatened to put Heil in a vehicle and take him to Wichita. Heil responded by grabbing the log chain from the kitchen and hitting it on his living room couch. Heil told Rowson if Rowson was big enough to put him in the car, he would go with them. Heil testified he would have used the chain at that moment if necessary. He eventually provided the location of Tyler's car.

In addition to Heil's testimony, his neighbor, Jayme Cartlich, testified that she was at his house the day of Tyler's death and the following day. She stated that early on the second day, Heil came in wet and dirty—and went straight to his bedroom without acknowledging her. Several weeks later Heil came to her house looking for "Ol' boy or Ol' buddy"—which she said referred to her boyfriend and roommate, Max Hahn.

9

The State also presented testimony from Leha Vaught, a friend of Heil's, who testified that a week after Tyler's death, Heil told her about the tag light episode. Heil said Tyler had called him to say the tag lights were out, that she was calling the cops, and he needed to be careful otherwise he would get caught. Heil also told her that he and "Ol' Boy" had killed Tyler by taking her out to a dirt road on the premise of buying drugs, he had beaten her with a log chain and strangled her, and they both held her head under water until she quit moving. According to Vaught, Heil said "he had to stop her before . . . she had called the cops because he could not get caught."

Vaught also testified that Heil had said he was upset with Tyler because on a couple of occasions she had "stolen things from his house, stolen drugs from him."

The defense presented testimony from Stephanie Hewitt, an inmate in a temporary cellblock next to Heil after he was arrested. Hewitt testified that Heil admitted he had killed Tyler and someone else was with him. She also testified he told her that during his communications with Tyler about the tag light incident, Tyler threatened to call the cops because he didn't return her car and pay her like he had said. Per Hewitt, "[Heil] said, 'Nobody fucks with me or my family,' and that's why he killed her."

Also testifying for the defense was Heil's friend, Angela Helko. Heil told her that he and somebody else had killed someone. According to Helko, Heil identified that other person as Chuck or Charles—not Dane DeWeese.

DeWeese testified in his own defense. He admitted that he resumed his meth use 2 months before Tyler's death, and his usage got heavier the second month. According to DeWeese, around 11:30 on the night of Tyler's death, he got a call from Heil saying he needed a ride to get some dope. He then picked up Heil and Tyler. He admitted going to the gas station with them, traveling on the interstate, and obtaining drugs. But he testified

10

he later dropped off Tyler and Heil at Heil's house and went home where he changed clothes and smoked some drugs Heil had given him. DeWeese expressly denied being with Heil at the scene of Tyler's death.

DeWeese also testified to taking Wells and their baby to the hospital. But after they returned home, he received an early morning call from Heil, who asked for a ride to Heil's car. He picked up Heil and drove him to a car—not belonging to Heil—which turned out to be in front of DeWeese's house. Heil drove off, and DeWeese turned home.

After a 12-day trial, the jury convicted DeWeese of Tyler's premeditated first-degree murder and conspiracy to commit first-degree murder.

*Investigator Melissa Short's rejected report and DeWeese's motion for new trial*

Nine days after the jury's guilty verdict, DeWeese filed a motion for new trial. In it, he stated that on April 11, 2014—3 days after the verdict—the State provided the defense a copy of a report written by Investigator Melissa Short of the Salina Police Department, dated May 31, 2013. DeWeese argued the report contained "material facts and information directly relevant to the facts and issues presented to the jury." At the close of the eventual hearing on DeWeese's motion, the district court denied it.

The court found that Investigator Short prepared her report on her last day of work, and it detailed her involvement with Tyler's murder case. Because it was Short's last day, she did not know her report was later rejected by the electronic reporting system. An administrator for the police department discovered Short's rejected report approximately a year later, and it was immediately turned over to the County Attorney's office. On April 11, 2014, that office turned the report over to defense counsel. The court

11

concluded the failure to turn over the report was not the result of intentional or negligent omission by the County Attorney's office.

The court found that most of the report's information had been disclosed to defense counsel by other means. The only information not previously shared was a statement by Brandi Rader, Heil's roommate for 4 days earlier in the month of Tyler's death. Rader had told Short that (1) Heil was looking for an opportunity to rob Tyler and her mom of a large quantity of drugs, (2) Heil used a gun to threaten Rader and her husband, and (3) the Raders fled to Texas 1 week before the murder out of fear for their lives.

The court observed that the question to be answered was whether Rader's statement was "sufficiently material to undermine the confidence and the verdict of this jury." It then analyzed the Rader information under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). At the outset it found that several *Brady* requirements had been met: The information was favorable to DeWeese and was not disclosed to the defense before trial.

The court also found the State's case relied heavily on Heil's account of the events and his assertion that DeWeese initiated the events and conspired to kill Tyler because he believed she stole from him, "but that Joel Heil actually physically carried out those acts." It further found that the defense and the State's own witnesses established that Heil and Tyler had a contentious, drug-fueled relationship, that he suspected her of being an informant, and that he was angry with her regarding the trip to Wichita. The court also found that the evidence established Heil was in the midst of a confrontational, paranoid and downward spiral fueled by methamphetamine.

The court additionally found that the Rader information was impeachment evidence the defense would have used at trial to support the theory that Heil murdered Tyler as part of his plan to rob her. But it further found that the defense already had thoroughly impeached Heil regarding his prior inconsistent statements, his motivations for testifying—including the existence of a prior robbery case—and the benefits he received from his plea bargain with the State for testifying. The court also found the jury was well aware that Heil was a "gun-toting," violent drug dealer and meth user who had previously committed various nefarious deeds. And the issue with the Raders was remote in time, when compared to the more recent events surrounding Heil's trip to Wichita and his volatile relationship with Tyler—which defense counsel thoroughly covered at trial.

Ultimately, the court ruled:

"The jury was well aware of Mr. Heil's criminal propensities and his motive for testifying. Given the quality and quantity of impeaching cross-examination at trial, no reasonable jury would have reached a different result if this suppressed evidence was presented. . . . For the purposes of the third *Brady* factor, the information from Ms. Rader is not material, the defendant received a fair trial in its absence and it does not undermine the confidence of the trial's outcome. That motion is denied."

The court later imposed a life sentence with a mandatory 25 years for premeditated first-degree murder and a consecutive sentence of 131 months for conspiracy to commit first-degree murder. DeWeese timely appeals.

Jurisdiction is proper under K.S.A. 2015 Supp. 22-3601(b)(3), (4) (maximum sentence of life imprisonment imposed for an off-grid crime [first-degree murder]).

More facts will be added as necessary to the analysis.

ANALYSIS

Issue*: The district court did not abuse its discretion when it denied DeWeese's motion for new trial based on a* Brady *violation.*

DeWeese argues the district court erred in denying his motion for new trial in which he asserted the State's failure to timely disclose the Short report violated its obligation under *Brady*, 373 U.S. 83. In contending the report contained valuable evidence he could have used for impeaching Heil at trial, he frames the specific issue as:

> "Whether the evidence of a desire to harm the victim [Tyler], which contradicted the actual killer's testimony [Heil] that he lacked motive and that the killing was done at the defendant's [DeWeese] behest, created a reasonable probability that had the evidence been disclosed to the defense, the result of the trial would have been different, thus requiring a new trial."

The State essentially responds that the court did not err because the report does not put the whole case in such a different light as to undermine confidence in the jury's verdict. Among other things, it contends the evidence from the report is simply cumulative to evidence admitted at trial. See *State v. Warrior*, 294 Kan. 484, 511-12, 277 P.3d 1111 (2012).

*Standard of review*

We review de novo a trial court's determination regarding the existence of a *Brady* violation but with deference to that court's findings of fact. *Warrior*, 294 Kan. at 510. And the court's denial of the defendant's motion for new trial is reviewed under an abuse of discretion standard. 294 Kan. at 510. This court's abuse of discretion standard is well known:

""Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. [Citation omitted.]" *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* ____ U.S. ____, 132 S. Ct. 1594 (2012).'" *State v. Shank*, 304 Kan. 89, 92, 369 P.3d 322 (2016) (quoting *State v. Wilson*, 301 Kan. 403, 405, 343 P.3d 102 (2015).

The party asserting an abuse of discretion bears the burden of establishing such abuse. *State v. Schow*, 287 Kan. 529, 541, 197 P.3d 825 (2008). Here, that burden is DeWeese's, and he claims the court incorrectly determined the report was immaterial— *i.e.*, that the court made an error of law.

*Discussion*

In *Brady v. Maryland*, the United States Supreme Court held: "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. So prosecutors have a positive duty to disclose evidence favorable to the accused—which encompasses both exculpatory and impeachment evidence. *Warrior,* 294 Kan. at 505-06 (citing *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 [1999]).

This court requires three essential elements to establish a *Brady* violation: "'(1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish

15

prejudice.'" *State v. Moore*, 302 Kan. 685, 700, 357 P.3d 275 (2015); see also *Strickler*, 527 U.S. at 290 (prejudice encompasses the materiality requirement of *Brady*).

Here, as in *Warrior,* the first two *Brady* elements are not at issue. The State concedes that Short's report contained impeachment evidence and that it was inadvertently suppressed by the State. Accordingly, we need only focus on the third element—*i.e.*, whether the evidence is material. See *Warrior*, 294 Kan. at 507.

When we consider this *Brady* element of materiality, we employ a "reasonable probability" test:

> """The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."'" *State v. Williams*, 303 Kan. 585, 597, 363 P.3d 1101 (2016) (quoting *Warrior*, 294 Kan. at 507).

In short, "'Does the [newly disclosed] evidence put the whole case in such a different light as to undermine confidence in the verdict?'" *Moore*, 302 Kan. at 701 (quoting *Warrior*, 294 Kan. at 511).

Some of the evidence in Short's undisclosed report was previously disclosed to the defense via other means and is not at issue. See *Wilkins v. State*, 286 Kan. 971, 990, 190 P.3d 957 (2008) (holding newly disclosed evidence did not support a *Brady* claim where the defense was aware of it prior to trial). So this court must determine if the remaining evidence from the report creates a reasonable probability that the result of the trial would have been different had the State timely disclosed that evidence.

16

DeWeese particularly argues the importance of the Short report's remaining information in his brief:

"The obvious motivation for Joel [Heil] to kill Kristin [Tyler] was the trip to Wichita the day before. Playing down what had happened with Kristin in Wichita the day before she died, *Joel claimed he was over that and held no grudge against Kristin.* For it to be believable that someone else was involved and that he was only the henchman, Joel had to present an alternative theory. Indeed credibility was critical if Joel was to take advantage of the bargain the State was offering . . . . *To accomplish that, Joel offered a motive for Dane* [defendant] *to have Kristin killed, while diffusing any suggestion that he might have wanted her dead.*" (Emphasis added.)

While conceding Heil's "obvious motivation" to kill Tyler was the Wichita trip, DeWeese specifically argues that Rader's information provided yet another Heil motive which would have impeached his testimony that claimed DeWeese had the primary motive to kill Tyler. As DeWeese further contends in his brief, evidence

"as to why Joel [Heil] *really* killed her would have cast doubt on Joel's claims that Dane [defendant] was the mastermind or that Dane even had a role in her death. The Raders would have provided that motive. . . .

". . . *The ability of the defense to impeach Joel with the attempted robbery* [claimed by Rader] *was material to destroying not just his credibility but placing the motive for her death squarely on Joel's shoulders where it belonged.* Because the evidence of Dane's involvement was by no means overwhelming, there was a reasonable probability that the result of the trial would have been different." (Emphasis added.)

The State generally responds that both parties presented evidence that Heil had a contentious relationship with Tyler and that he was upset with her prior to her murder. The State also argues that the undisclosed evidence of Heil's plan to rob Tyler and her

17

mother was cumulative to the Wichita trip or merely reinforced other impeachment evidence. As for evidence that Heil threatened the Raders who later fled as a result, the State contends that this incident is remote in time and unconnected to Tyler's death. We basically agree with the State.

We begin with the issue of cumulative evidence. The materiality calculus includes acknowledging that when the undisclosed evidence merely reinforces evidence already presented to the jury—or as the State argues here, if the witness was already significantly impeached with other evidence—the new evidence is considered cumulative and the prosecution's withholding it does not qualify as a *Brady* violation. See *Warrior*, 294 Kan. at 511-12; *Wilkins v. State*, 286 Kan. 971, 991, 190 P.3d 957 (2008). As a result, we need to specifically compare the impeachment evidence already presented to the jury to the impeachment evidence in the Short report not previously disclosed by other means.

Accordingly, our focus is on yet another motive for Heil to kill Tyler that was in the evidence presented to the jury. Specifically, Leha Vaught testified that Heil had told her he was upset with Tyler because on a couple of occasions she had "stolen things from his house, stolen drugs from him." The State's allegation that DeWeese wanted Tyler dead because she stole money and drugs from his garage was a sufficient motive for DeWeese's murder charges. So any evidence indicating that Tyler stole things and drugs from Heil could impeach his testimony "that he lacked motive and that the killing was done at the defendant's behest." Accordingly, Rader's information about Heil's plan to rob Tyler of drugs as a motive to kill her—and thus impeach Heil—would clearly be cumulative to Vaught's testimony.

The record also contains evidence of an additional motive for Heil to kill Tyler suggested by the district court yet overlooked by DeWeese's argument: his concern she would inform the police about his illegal activities. Heil admitted he once had checked

18

Tyler's car for electronic bugs, had expressed his suspicions to other individuals that she was a police informant, and that he was paranoid about confidential informants.

Others testified Heil told them that Tyler had threatened to call the cops because he had not returned her car and paid her in meth for its use. "[H]e had to stop her before she . . . had called the cops because he could not get caught." And "'Nobody fucks with me [Heil] or my family,' and that's why he killed her." The latter comments may have been based on his anger and desire for revenge concerning the Wichita tag light incident—the incident which DeWeese claims is Heil's obvious motivation to kill her. But as DeWeese points out, Heil testified the incident had nothing to do with her homicide the next day. So in the absence of a grudge from that incident, the comments may simply have been based on Heil's cool instinct for survival once he got over his anger, *i.e.*, yet another motive to kill.

Rader's information about Heil's plan to rob Tyler of drugs as a motive to kill her—and thus impeach Heil—would clearly be cumulative to this other evidence of motive. Additionally, Rader's information would clearly be cumulative to evidence of still another Heil motive established in his testimony. Specifically, right after he testified the tag light incident had nothing to do with Tyler's homicide, he admitted he owed her money. Given their drug-based relationship, this was a debt likely extinguished upon her death. See *State v. Boldridge*, 274 Kan. 795, 809, 57 P.3d 8 (2002) (holding evidence of financial gain motive for murder).

We agree with the State that Heil's credibility also was impeached by other evidence at trial. Among these are his inconsistent statements about the identity of his coparticipant in the murder. Heil told Leha Vaught that "Ol' Boy" helped with the killing. While his cell phone directory identified this person as DeWeese, Jayme Cartlich said Heil was referring to her roommate Max Hahn when he was looking for "Ol' boy."

19

Additionally, Heil told Angela Helko that the coparticipant was named "Chuck or Charles"—not Dane DeWeese. Indeed, Heil later admitted during his testimony that he was referring to Chuck Rowson to implicate him because he did not like the man and wanted to draw attention from DeWeese. He thus not only gave yet another name for his coparticipant but also demonstrated his willingness to lie. And of course at trial Heil implicated DeWeese. See *Warrior*, 294 Kan. at 511 (impeachment included witness initially identifying person other than coparticipant as the shooter and "'making up stuff'").

The defense further impeached Heil's credibility when it cross-examined him about his criminal behavior, including his drug use and dealing. Heil testified that his meth use caused sleeplessness and paranoia, *i.e.*, leading him to use a bug detector on Tyler's car. Heil said he was a monster while using meth. He described this behavior as lacking self-respect and respect for others and that he would have no feelings for people while using.

Heil admitted threatening Tyler and Rowson with his log chain the same day of her murder. He also admitted that he had taken meth just 1 or 2 hours before that incident in his house and that he was high on meth during Tyler's murder—where his efforts to kill her included beating her head with his log chain, strangling her with a cord from his hooded sweatshirt, and forcing her face into the mud with his feet. Moreover, he testified that part of his plea agreement—in exchange for his testimony against DeWeese—included pleading guilty to conspiracy to commit robbery in a separate case, as well as receiving less than a hard 50 sentencing recommendation for his part in Tyler's prolonged and brutal killing.

Accordingly, Rader's statements that Heil threatened her and her husband with a gun and they later fled the state because of him only reinforces evidence already

20

presented to the jury on Heil's credibility—*i.e.*, that he had criminal tendencies, sometimes violent.

In short, the prosecution and defense presented evidence of several different Heil motives to kill Tyler, as well as ample evidence of other impeachment matters such as his inconsistent statements and violent tendencies. When compared with this evidence, the new evidence relied upon by DeWeese from Short's undisclosed report is cumulative and, therefore, not material under *Brady.* See *Warrior*, 294 Kan. at 511-12 (citing cases for the principle that undisclosed impeachment evidence is not material, *e.g.*, it is cumulative, where the witness already has been impeached through other means); *Wilkins*, 286 Kan. at 991 (reports' "principal value was mere reinforcement of evidence already before the jury"; thus, immaterial).

The decision by the Tenth Circuit Court of Appeals cited in *Warrior*—and by the district court in the instant case—is instructive. In *United States v. Trujillo*, 136 F.3d 1388 (10th Cir. 1998), the court held that the "failure to disclose impeachment evidence does not require automatic reversal, *even where, as here, the prosecution's case depends largely on the credibility of a particular witness*." (Emphasis added.) 136 F. 3d at 1393. There, the undisclosed evidence pertained to prior inconsistent statements the witness, Ladd, had made to the FBI. In those statements, Ladd claimed he had no involvement with any robberies in Oklahoma. But when Ladd realized he would not avoid charges, he implicated himself and the defendant.

At trial, Ladd admitted that he had three prior felony convictions and that he was testifying as part of a plea agreement. The court determined that the undisclosed inconsistent statements were cumulative to Ladd's testimony on direct and cross-examination and would have provided only marginal additional support for the defense. Ultimately, the court concluded the information was unlikely to have changed the jury's

decision because the jury was well aware of Ladd's criminal propensities and motive for testifying. 136 F.3d at 1394; see also *State v. Armstrong*, 240 Kan. at 452 (murder prosecution's "key witness" was impeached with his prior inconsistent statements and alleged concessions made by dismissal of criminal charges against son; "We do not believe a different result would have occurred by confronting [witness] with the alleged 'concessions' made to his daughter Tammy" which had not been disclosed by State).

Given the facts of this case, it cannot be concluded there was a reasonable probability that, had the Short report been timely disclosed to the defense, the result of the proceeding would have been different—*i.e.*, this evidence does not put the whole case in such a different light as to undermine confidence in the verdict. See *Warrior*, 294 Kan. at 511-12. The district court essentially concluded the same. Accordingly, it did not abuse its discretion in denying DeWeese's motion for new trial.

Affirmed.