FILED
United States Court of Appeals
Tenth Circuit

May 12, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

NEIL RICK VIGIL,

      Defendant - Appellant.

No. 10-4114

Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:09-CR-00884-DB-1)

Benjamin C. McMurray, Assistant Federal Public Defender (Steven B. Killpack, Federal Public Defender, and Scott Keith Wilson, Assistant Federal Public Defender, with him on the briefs), Salt Lake City, Utah, for Defendant-Appellant.

Karin M. Fojtik, Assistant United States Attorney (Carlie Christensen, United States Attorney, with her on the brief), Salt Lake City, Utah, for Plaintiff-Appellee.

Before **KELLY, TACHA,** and **EBEL,** Circuit Judges.

**EBEL**, Circuit Judge.

Defendant-Appellant Neil Vigil was arrested after police pulled him over and found in his car a vast cache of counterfeit identifications and other materials indicative of identity theft. Mr. Vigil ultimately reached a plea deal with the government. At sentencing, the district court applied a two-level enhancement under Section 2B1.1(b)(4) of the Sentencing Guidelines, which provides for such an enhancement where "the offense involved receiving stolen property, and the defendant was a person in the business of receiving and selling stolen property" (the "ITB Enhancement"). The district court also imposed a $10,000 fine over Mr. Vigil's objection, despite the finding in the Presentence Report that Mr. Vigil did not appear able to pay a fine.

Mr. Vigil contends that the district court erred in both applying the enhancement and imposing the fine. First, Mr. Vigil argues that the ITB Enhancement only applies where a defendant actually has sold stolen property, and there is no evidence that he ever sold stolen property in this case. Second, Mr. Vigil argues that imposition of the fine was improper in light of his inability to pay a fine and his obligation to pay restitution. For the reasons discussed below, we reverse the district court's application of the enhancement and imposition of the fine, vacate Mr. Vigil's sentence, and remand for resentencing.

## BACKGROUND

On July 18, 2009, Mr. Vigil was pulled over by an officer from the Cedar City, Utah, Police Department. During a search of the car, the officer found extensive

2

evidence of identity theft, including hundreds of cashed and uncashed checks, several driver's licenses of other individuals, counterfeit identifications showing Mr. Vigil's picture, numerous counterfeit checks, a large volume of check-stock and photo paper, a knife, pearl pigment, spray glue, and a wallet belonging to one theft victim, "R.L." The officer also found four laptop computers and electronic storage devices, which, as a subsequent search revealed, contained (1) over 200 jail booking photos and/or driver's license photos of other individuals; (2) over 500 scanned images of identification templates and identification features, stolen identifications, bank logos, checks, birth certificates, and counterfeit identifications bearing Mr. Vigil's photo; (3) over 600 logged check records regarding the production of counterfeit checks; (4) other files related to the production of checks; and (5) other files related to apparent victims of identity theft.

Subsequent investigation revealed that R.L.'s wallet had been stolen from a Gold's Gym locker, and that Mr. Vigil had used R.L.'s identity to obtain credit cards from Cabelas and Best Buy. Mr. Vigil then used those cards to make various purchases and obtain a $1,000 cash advance. The investigation also revealed that Mr. Vigil had used another victim's identification to negotiate a counterfeit check at Zions Bank in Logan, Utah, and to open an account and receive cash back at a Wells Fargo branch. During a police interview, Mr. Vigil admitted that in addition to stealing checks from mail boxes and wallets from gym lockers, he purchased information stolen by others.

On November 24, 2009, Mr. Vigil was indicted on seven counts of fraudulent conduct. He ultimately pled guilty to three counts: (1) access device fraud, in violation of

3

18 U.S.C. § 1029(a)(5); (2) aggravated identity theft, in violation of 18 U.S.C. § 1028(a); and (3) possession of stolen mail, in violation of 18 U.S.C. § 1708.

With respect to the access-device-fraud and possession-of-stolen-mail counts, the Presentence Investigation Report ("PSR") calculated Mr. Vigil's offense level to be 17, which included, inter alia, a base-offense level of six (U.S.S.G. § 2B1.1(a)(2)); a six-level enhancement for an offense involving 250 or more victims (the "Victim Enhancement") (U.S.S.G. § 2B1.1(b)(2)(C)); and a two-level enhancement under the ITB Enhancement. With respect to the aggravated-identity-theft count, the PSR noted that the Guideline sentence is the term of imprisonment required by 18 U.S.C. § 1028A —in this case, a two-year consecutive sentence.

The PSR calculated Mr. Vigil's criminal-history category to be VI, based on 19 criminal-history points. Accordingly, the PSR calculated Mr. Vigil's Guideline range to be 51-63 months for the access-device-fraud and possession-of-stolen-mail counts, and 24 months for the aggravated-identity-theft count, for a total range of 75-87 months.

The PSR also recommended ordering restitution in the amount of $15,642.91 (including $2,717.19 to Cabelas; $3,918.62 to Best Buy; $7,455.10 to Zions Bank; and $1,552 to Wells Fargo). Although the PSR described several jobs held by Mr. Vigil in the past, with pay ranging from $6.50 to $17 per hour, the PSR concluded that he did not appear to have the ability to pay a fine due to his apparent lack of income or assets.

In his sentencing memorandum, Mr. Vigil objected to the PSR's application of the Victim and ITB Enhancements. Mr. Vigil also contended that the restitution amount was

4

limited to Cabelas's loss of $2,717.19, because the other losses described in the PSR stemmed from conduct underlying counts that were dismissed pursuant to the plea agreement and thus not subject to restitution.

At sentencing, Mr. Vigil and the government agreed that the number of "victims" that could be taken into account for the purposes of the Victim Enhancement was actually ten, and thus that the Victim Enhancement provided for a two-level increase instead of a six-level increase. The parties also agreed that under the plea agreement, restitution was limited to $2,717.19. However, the parties disagreed about the applicability of the ITB Enhancement. Mr. Vigil argued that while he received stolen identity information and checks, there was no evidence that he sold such material, and thus he could not be deemed to be in the business of receiving <u>and selling</u> stolen property. The government, in turn, argued that while it did not have evidence that Mr. Vigil specifically sold stolen property, Mr. Vigil's lifestyle, coupled with his apparent unemployment, permitted the inference that he was in the business of receiving and selling stolen property.

The court rejected Mr. Vigil's argument and applied the ITB Enhancement, concluding that the totality of the circumstances indicated that the enhancement applied:

> Here I find from the totality of the circumstances that this guideline provision fits this case. It says if the offense involved receiving stolen property and the defendant was the person in the business of receiving and selling stolen property, increase by two levels. Let me say it this way, that if this case does not fit the purpose behind that guideline provision, then I don't know one that does. Given all of the factual record that I have before me on what the defendant was about, what he had in his possession and what he admitted to doing with this property that he would steal and make use of, and if we're going to quibble about what the word selling means, we

5

are not going to do it before me. If this does not fit here, then it is difficult for me to think of a case where it would fit any better, especially given the volume of materials here that were involved with Mr. Vigil. I respectfully disagree with the defense's position on that point.

(Record on Appeal ("ROA"), vol. ii at 13.)

Accordingly, the court found that with respect to the access-device-fraud and possession-of-stolen-mail counts, Mr. Vigil's offense level was 13 (reflecting the four-point reduction in the Victim Enhancement). Coupled with a criminal-history category of VI, this yielded a Guideline range of 33-41 months. Although Mr. Vigil argued for a sentence of 33 months on all counts, the court rejected Mr. Vigil's request and applied the two-year sentence on the aggravated-identity-theft count consecutively to the high end of the Guideline range on the other counts, for a total of 65 months.

The court then ordered restitution of $15,642.91, the amount set forth in the PSR. However, Mr. Vigil again objected that only Cabelas's loss of $2,717.19 could be subject to restitution, as the other losses stemmed from conduct underlying counts that were dismissed pursuant to the plea agreement. The government conceded this point, but the court asked for confirmation that the plea agreement "tie[d the court's] hands," and commented that "[p]eople should pay back money they steal." (Id. at 33.) Ultimately, however, the court imposed the lower restitution amount. The court then stated that it was not imposing a fine, but in the very next sentence stated, "No, wait, I am. A fine of $10,000." (Id. at 34.) Mr. Vigil objected to the fine on the grounds that he was indigent, but the court made no further findings or comments on this issue.

6

## I.    The ITB Enhancement

"In reviewing a district court's application of the Guidelines, we review its legal conclusions de novo and its factual findings for clear error." United States v. De La Cruz-Garcia, 590 F.3d 1157, 1158 (10th Cir. 2010). "[T]o the extent [a] defendant asks us to interpret the Guidelines or hold that the facts found by the district court are insufficient as a matter of law to warrant an enhancement, we must conduct a de novo review." United States v. Martinez, 602 F.3d 1156, 1158 (10th Cir. 2010) (internal quotation marks omitted). Accordingly, although we review the factual findings made by the district court for clear error, we review de novo whether those facts are sufficient to warrant the ITB Enhancement.

Mr. Vigil contends that the ITB Enhancement applies only to professional fences, and thus that for the enhancement to apply there must be evidence that a defendant actually sold stolen property.[1] Accordingly, Mr. Vigil argues, the district court erred in applying the ITB Enhancement in his case because there is no evidence that he ever sold any stolen property. The government, conversely, argues that we need only refer to a four-factor test set forth in an application note of the ITB Enhancement—a test that at

---

[1] In his appellate briefs, Mr. Vigil also argued that the first part of the ITB Enhancement—that the offense involve receiving stolen property—was not satisfied in his case because none of the specific offenses for which he was convicted contain as an element the receipt of stolen property. However, Mr. Vigil withdrew this contention at oral argument.

least on its face appears not to require evidence that the defendant actually sold stolen goods—to determine whether the enhancement applies. The government therefore contends that the enhancement can be applied without evidence that the defendant sold stolen property.

We agree with Mr. Vigil. As described below, the text and legislative history of the ITB Enhancement indicate that for the enhancement to apply, there must be (1) evidence that the defendant received and sold stolen property, and, further, (2) evidence that the defendant was in the business of receiving and selling stolen property. We find no such evidence in the record in this case.

### A. The ITB Enhancement Applies Only to Professional Fences—Those That Receive and Sell Stolen Property.

This Court has yet to construe the ITB Enhancement. However, it can hardly be disputed that the ITB Enhancement is directed at professional fences—those that receive and sell stolen goods, not those that merely receive goods for their own use or sell goods that they themselves steal.

First, by restricting application of the ITB Enhancement to defendants who are "in the business of receiving and selling stolen property," the plain language of the ITB Enhancement indicates that it applies only to professional fences. U.S.S.G. § 2B1.1(b)(4). Courts have thus held that the ITB Enhancement cannot apply to a defendant who merely sells goods that he himself has stolen, or merely uses goods stolen by and received from others. See United States v. Kimbrew, 406 F.3d 1149, 1153 (9th

8

Cir. 2005) ("[N]early every circuit that has addressed the meaning of this enhancement has agreed that a thief who sells goods that he himself has stolen is not in the business of receiving and selling stolen property." (internal quotation marks omitted)); United States v. Saunders, 318 F.3d 1257, 1267 (11th Cir. 2003) (finding that a prerequisite to the application of a similar enhancement under U.S.S.G. § 2B6.1(b)(2) "is that the defendant personally received and sold stolen property");[2] United States v. McMinn, 103 F.3d 216, 222 (1st Cir. 1997) ("[A] thief would not qualify for the ITB enhancement if the only goods he distributed were those which he had stolen."); United States v. Sutton, 77 F.3d 91, 94 (5th Cir. 1996) ("[O]ur approach views the [ITB E]nhancement as a punishment for fences, people who buy and sell stolen goods, thereby encouraging others to steal, as opposed to thieves who merely sell the goods which they have stolen.").

Moreover, the legislative history of the ITB Enhancement further supports this interpretation. Originally, Section 2B1.1 governed only "Larceny, Embezzlement, and Other Forms of Theft," and did not contain the ITB Enhancement. U.S.S.G. § 2B1.1

---

[2] Section 2B6.1 of the Guidelines governs offenses involving alteration or removal of motor vehicle identification numbers, and provides that "if the defendant was in the business of receiving and selling stolen property, increase by 2 levels." U.S.S.G. § 2B6.1(b)(2). The Saunders court noted the "striking similarities" between the ITB Enhancement and the enhancement under Section 2B6.1(b)(2), and relied on other courts' analysis of the ITB Enhancement in construing Section 2B6.1(b)(2). Saunders, 318 F.3d at 1264 n.9; see also United States v. Maung, 267 F.3d 1113, 1118 n.5 (11th Cir. 2001) ("[Other courts'] analysis of the phrase 'in the business of receiving and selling stolen property' in interpreting § 2B1.1(b)(4)(B) applies to the identical language in § 2B6.1."), abrogated on other grounds by Dolan v. United States, 130 S. Ct. 2533 (2010).

(1987).[3] Instead, Section 2B1.2, which governed "Receiving Stolen Property," provided an enhancement where "the offense was committed by a person in the business of selling stolen property." Id. § 2B1.2(b)(2)(A). The "Background" to Section 2B1.2 explained the rationale for the enhancement: "Persons who receive stolen property for resale receive a sentencing enhancement because the amount of property is likely to underrepresent the scope of their criminality and the extent to which they encourage or facilitate other crimes." Id. § 2B1.2 cmt. background (emphasis added).

In 1989, Section 2B1.2 was expanded to cover "Transporting, Transferring, Transmitting, or Possessing" in addition to "Receiving" stolen property, and the Commission added the words "receiving and" to the enhancement, so that it applied where "the offense was committed by a person in the business of receiving and selling stolen property." U.S.S.G. app. C, amend. 102 (Nov. 1, 1989). In 1993, Section 2B1.2 was deleted and consolidated with Section 2B1.1, and the enhancement was moved there. In addition, the enhancement was amended to add the first clause, requiring that "the offense involved receiving stolen property," thereby maintaining the enhancement's applicability only to offenses involving receipt. U.S.S.G. app. C, amend. 481 (Nov. 1, 1993).

---

[3] Section 2B1.1 now governs "Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; [and] Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States." U.S.S.G. § 2B1.1.

In light of this legislative history, courts prior to 2001 construed the ITB Enhancement to apply to professional fences; that is, those who buy and receive stolen property. See McMinn, 103 F.3d at 220 (finding that the legislative history of the ITB Enhancement "substantiates that it was meant to cover the professional fence, not the thief"); United States v. Warshawsky, 20 F.3d 204, 214 (6th Cir. 1994) ("A person 'in the business of receiving and selling stolen property' is a person once referred to less flatteringly as a 'fence.'"); United States v. St. Cyr, 977 F.2d 698, 703 (1st Cir. 1992) ("Where there is no indication either of a pattern of dealing in stolen property or of a developed operation that promises such consistency for the future, the defendant is unlikely to be 'in the business.'"); United States v. Braslawsky, 913 F.2d 466, 468 (7th Cir. 1990) ("The common understanding of a person in the business of receiving and selling stolen property is a professional fence and not a person who sells property that he has already stolen.").

However, courts differed in the nuances of their application of the ITB Enhancement, and, arguably, a circuit split developed. The Fifth, Sixth, and Seventh Circuits applied a "fence test," in which "the sentencing courts merely examine[] the defendant's operation to determine: (1) if stolen property was bought and sold, and (2) if the stolen property transactions encouraged others to commit property crimes." Warshawsky, 20 F.3d at 215; see also United States v. Esquivel, 919 F.2d 957, 960 (5th Cir. 1990); Braslawsky, 913 F.2d at 468. The First, Third, and Ninth Circuits adopted a "totality-of-the-circumstances" test, in which "the sentencing judge must undertake a

11

case-by-case approach, weighing the totality of the circumstances, with particular emphasis on the regularity and sophistication of a defendant's operation, in order to determine whether a defendant is 'in the business' of receiving and selling stolen property." St. Cyr, 977 F.2d at 703; see also United States v. Cottman, 142 F.3d 160, 165-66 (3d Cir. 1998); United States v. Zuniga, 66 F.3d 225, 228-29 (9th Cir. 1995).

In 2001, the Sentencing Commission resolved this conflict by adding Application Note 5 to Section 2B1.1. U.S.S.G. app. C, amend. 617 (Nov. 1, 2001). Application Note 5 provides as follows:

> For purposes of subsection (b)(4), the court shall consider the following non-exhaustive list of factors in determining whether the defendant was in the business of receiving and selling stolen property:
> (A) The regularity and sophistication of the defendant's activities.
> (B) The value and size of the inventory of stolen property maintained by the defendant.
> (C) The extent to which the defendant's activities encouraged or facilitated other crimes.
> (D) The defendant's past activities involving stolen property.

U.S.S.G. § 2B1.1 cmt. appl. n.5. In describing the reason for the amendment, the Sentencing Commission noted the similarity between the "fence" test and the "totality-of-the-circumstances" test, in that under either test, "courts consider the sophistication and regularity of the business as well as the control, volume, turnover, relationship with thieves, and connections with buyers." U.S.S.G. app. C, amend. 617 (emphasis added). However, the Commission explicitly stated that it was adopting the totality-of-the-circumstances approach "because it is more objective and more properly targets the

12

conduct of the individual who is <u>actually in the business of fencing</u>." <u>Id.</u> (emphasis added).

The Commission thus appears to have reaffirmed that the ITB Enhancement applies only to fences—those that buy <u>and sell</u> stolen property. Accordingly, in construing the ITB Enhancement, courts have found that adoption of the "totality-of-the-circumstances" test—rather than the "fence" test—does not alter the threshold requirement that the defendant be a "fence." <u>See</u> <u>Kimbrew</u>, 406 F.3d at 1153-54 ("[T]here is nothing inconsistent about adopting a totality of the circumstances approach to the 'in the business' question, while also requiring a defendant to be a fence—to receive and sell property stolen by others—before the enhancement applies. . . . In other words, the 'totality of the circumstances' and 'fence' tests diverge on the considerations that apply to being 'in the business,' but both tests operate on the predicate that the defendant is a fence."); <u>Saunders</u>, 318 F.3d at 1268-69 ("[A]n interpretation of the enhancement requiring that the defendant be a fence is not inconsistent with our adoption of the totality of the circumstances test for applying the enhancement. . . . That the defendant must . . . receive and sell stolen goods is the common denominator between the [fence and totality-of-the-circumstances] tests."); <u>Cottman</u>, 142 F.3d at 167 n.9 ("Although some Circuits have described the 'totality of the circumstances' approach, upon which this Court relies, as a 'competing test,' nothing we said in [<u>United States v.</u> <u>King</u>, 21 F.3d 1302 (3d Cir. 1994),] forecloses us from requiring in the future that a defendant be a 'fence' for the enhancement to apply." (citation omitted)).

13

In short, it is apparent that in order for the ITB Enhancement to apply, one must

(1) receive and sell stolen property, and (2) be "in the business" of receiving and selling

stolen property.  Application Note 5 guides our determination of the latter inquiry, but

does not extinguish the former.  In providing that a court should consider, inter alia, the

regularity and sophistication of the defendant's "activities," the extent to which the

defendant's "activities" encouraged or facilitated other crimes, and the defendant's past

"activities" involving stolen property, Application Note 5 assumes that these "activities"

include both receipt and sales.  An interpretation of the ITB Enhancement that does not

require that the defendant receive and sell stolen property would contravene the text and

purposes of the enhancement.

**B.**    **The District Court Erred by Applying the ITB Enhancement in the Absence of a Factual Finding That Mr. Vigil Actually Sold Stolen Property.**

With the above-described principles in mind, we believe the district court erred in

applying the ITB Enhancement in this case.  As the government conceded, there is no

evidence that Mr. Vigil ever sold any stolen property, much less that he was "in the

business" of selling stolen property. (See Aple. Br. at 23 ("Admittedly, no direct

evidence of resale of the property stolen by Vigil was before the court."); ROA, vol. ii, at

10 ("[T]he truth be told, we are not able to pinpoint and say, look, he sold stuff right

there . . . .").)  If anything, the PSR indicates that Mr. Vigil used his own photograph in

14

conjunction with others' stolen identities to make fraudulent identifications for his own use.[4] (ROA, vol. iii at 6.)

In any event, the district court did not make <u>any</u> factual findings as to whether Mr. Vigil actually sold any stolen property. Instead, the court based its application of the ITB Enhancement on "what [Mr. Vigil] was about, what he had in his possession and what he admitted to doing with this property that he would steal <u>and make use of</u>." (ROA, vol. ii at 13 (emphasis added).) This reflects a legal conclusion that <u>using</u> stolen property equates with <u>selling</u> stolen property. That conclusion is incorrect. <u>See, e.g.</u>, Black's Law Dictionary 1360 (6th ed. 1990) (defining "sell" as "[t]o dispose of by sale" and "[t]o transfer title or possession of property to another in exchange for valuable consideration"). The court failed to make any finding that Mr. Vigil actually sold stolen property, and without such a finding, it was error for the district court to have concluded that Mr. Vigil was "in the business" of selling stolen property. Nor, on this record, would any such finding be supported factually.

---

[4] The record does reflect that Mr. Vigil's inventory included over 200 jail booking photos and/or driver's license photos of other individuals. However, the record is agnostic as to what Mr. Vigil was doing with these photographs. It is possible that these photos were somehow for sale, but it is equally possible that Mr. Vigil or others associated with him were merely planning to use the photos for their own illicit ends. The district court made no factual finding on this issue.

15

## C. The District Court's Error Was Not Harmless.

The government argues that even if the district court erred in applying the ITB Enhancement, this error was harmless because the record reflects that even if the Guideline range were lower, the court would have nonetheless varied upward to reach the 65-month sentence. This argument is without merit.

"Harmless error is that which did not affect the district court's selection of the sentence imposed." United States v. Montgomery, 439 F.3d 1260, 1263 (10th Cir. 2006) (internal quotation marks omitted). The burden of proving that the error is harmless is on the beneficiary of the error—in this case, the government. Id.; see also United States v. Abbas, 560 F.3d 660, 667 (7th Cir. 2009) ("To prove harmless error, the government must be able to show that the Guidelines error did not affect the district court's selection of the sentence imposed." (internal quotation marks omitted)).

The government is correct that at the sentencing hearing, the district court indicated that it thought a sentence even longer than 65 months may have been appropriate:

> Section 3553 says I'm supposed to look hard at protecting the community from the defendant. In this case if I were to read in this courtroom the explanation given in the presentence report of the defendant's conduct, I think most people would think the sentence should be higher. I just worry.

(ROA, vol. ii at 30.) In addition, although the district court reduced the Victim Enhancement from a six-level to a two-level increase based on the government's

16

concession regarding the number of victims, the court noted that in sentencing it would still consider the number of individuals impacted by Vigil's conduct:

> The number is going down, but that does not mean that I'm not [sic] eliminating my understanding of the dozens of people here who were affected by in [sic] a negative way the behavior of Mr. Vigil. I will take that into account in sentencing generally, but for guideline calculation purposes only, we're down to a level 13 with a criminal history category of six yielding a range of 33 to 41 months.

(Id. at 14.)

However, the court also indicated that, despite its view that the sentence probably should be longer, it intended to sentence within the Guideline range:

> With the guideline range I came in with, I thought the sentence would be 87 months. That was reduced because of the government's concession on the victim issue and essentially reduced this from 87 to 65 months. I guess for pragmatic and practical reasons I am staying within the guideline sentence range. I think the sentence probably should be a lot longer.

(Id. at 29 (emphasis added).) At no point did the court state that the sentence would be the same even if its calculation of the Guideline range were in error and the Guidelines range were actually lower still.

The record suggests that if the court had calculated the Guideline range differently, it still would have sentenced within that range. Indeed, the district court was initially prepared to impose an 87-month sentence, but reduced it to 65 months based on the applicable range. The record does not establish that had the court calculated the range to be lower, it would have nonetheless varied upward simply to add a few additional

17

months.[5]  The government thus cannot show that, if the court erred, the error was harmless.  We therefore vacate Mr. Vigil's sentence and remand to the district court for resentencing.  See United States v. Alapizco-Valenzuela, 546 F.3d 1208, 1215 (10th Cir. 2008) ("A non-harmless error in calculating the Guidelines range renders the sentence unreasonable and entitles the defendant to resentencing.").[6]

## II.    The Fine

This Court reviews the district court's imposition of the $10,000 fine for abuse of discretion.  See United States v. Trujillo, 136 F.3d 1388, 1398 (10th Cir. 1998), cert. denied, 525 U.S. 833 (1998).  Mr. Vigil argues that the district court erred in imposing a fine of $10,000 because (1) the PSR found that he was unable to pay a fine; (2) he

---

[5] It appears that without the ITB Enhancement, Vigil's offense level would only be reduced by one point, for a total of 12.  This is because Vigil received the benefit of a three-point reduction for acceptance of responsibility based on his pre-reduction offense level of 16.  See U.S.S.G. § 3E1.1 (providing for two-point reduction for acceptance of responsibility generally, but three-point reduction where "the offense level determined prior to the operation of [the reduction] is level 16 or greater").  Thus, if the ITB Enhancement does not apply, Vigil's pre-reduction offense level would be 14, and he would only qualify for a two-point reduction for acceptance of responsibility, resulting in an offense level of 12.

With an offense level of 12 and a criminal history category of VI, the Guideline range for the access-device-fraud and possession-of-stolen-mail counts would be 30-37 months.  U.S.S.G. Ch. 5, Sentencing Table.  Coupled with the two-year consecutive sentence for aggravated identity theft, the applicable Guideline range would be 54-61 months, instead of 57-65 months as found by the district court.

[6] The district court's error resulted in the calculation of an incorrect Guideline range.  However, because the Guidelines are advisory, the district court would still have discretion upon remand to vary upward from a properly-calculated Guideline range based on the court's considerations of the factors under 18 U.S.C. § 3553(a).

objected to the imposition of the fine on the basis of his inability to pay; and (3) the fine impermissibly impairs his ability to pay restitution. Because the district court abused its discretion by considering neither Mr. Vigil's ability to pay the fine nor the effect the fine might have on his ability to pay restitution, this part of Mr. Vigil's sentence must be reversed.

The Sentencing Guidelines provide that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). "If the defendant establishes that . . . he is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay all or part of the fine . . . , the court may impose a lesser fine or waive the fine." Id. § 5E1.2(e). As the plain language of Section 5E1.2 indicates, "[t]he defendant bears the burden of demonstrating an inability to pay a fine." United States v. Deters, 184 F.3d 1253, 1258 (10th Cir. 1999).

18 U.S.C. § 3572(a) sets forth factors that must be considered by a district court "[i]n determining whether to impose a fine, and the amount, time for payment, and method of payment of a fine." Section 5E1.2(d) of the Guidelines sets forth similar factors to be considered in determining the amount of a fine. Both sections include the defendant's ability to pay as a consideration. See 18 U.S.C. § 3572(a)(1)-(2); U.S.S.G. § 5E1.2(d)(2)-(3). In addition, under 18 U.S.C. § 3572(b), a "court shall impose a fine or other monetary penalty only to the extent that such fine or penalty will not impair the ability of the defendant to make restitution." See also id. at § 3572(a)(4) (providing that a

court shall consider "whether restitution is ordered or made and the amount of such restitution"); U.S.S.G. § 5E1.2(d)(4) (providing that a court shall consider "any restitution or reparation that the defendant has made or is obligated to make").

In imposing a fine, a district court is not required to make factual findings specific to each factor set forth in 18 U.S.C. § 3572(a) or U.S.S.G. § 5E1.2. See Trujillo, 136 F.3d at 1398; United States v. Washington-Williams, 945 F.2d 325, 328 (10th Cir. 1991). However, the record must reflect the court's consideration of the pertinent factors and the basis for the imposition of a fine. See Trujillo, 136 F.3d at 1398 ("It is sufficient that the record reflects the basis for the imposition of the fine."); Washington-Williams, 945 F.2d at 328 ("[S]atisfactory compliance with § 5E1.2 merely requires that the record reflect the district court's consideration of the pertinent factors prior to imposing the fine.").

In United States v. Foote, the defendant argued on appeal that the district court's imposition of a fine of $104,107.50 was excessive because it exceeded his ability to pay. 413 F.3d 1240, 1252 (10th Cir. 2005). We found that the record did not reveal "any findings by the district court supporting [the defendant's] ability to pay" the fine. Id. at 1253. We noted that although "[d]istrict courts are not required to make specific findings in cases where uncontested evidence establishes the defendant's ability to pay," the defendant in that case "disputed his ability to pay and presented evidence in support of his position." Id. Accordingly, we ordered that "[t]he district court on remand should

20

therefore make findings regarding [the defendant's] ability to pay and consider these findings in deciding the amount of the fine to impose." Id.[7]; see also United States v. Gonzalez, 541 F.3d 1250, 1256 (11th Cir. 2008) (per curium) ("[Defendant] objected at sentencing and the court therefore had notice of the need to provide some reasoned basis for imposing the fine. Because the record provides no explanation regarding the basis upon which the court imposed the fine, we vacate the sentence imposed by the district court and remand this case for resentencing." (citation omitted)).

In Mr. Vigil's case, the PSR described several jobs that he held in the past, including as a carpenter, a concrete finisher, and a laborer, with pay ranging from $6.50 to $17 per hour. The PSR also stated that "Mr. Vigil has employable skills in carpentry, concrete finishing, caulking, retail sales, computer repair, and Microsoft Office," and "has past certification in CPS and has a heavy machinery operator's license." (ROA, vol. iii at 28.) However, the PSR concluded that Mr. Vigil did not appear to have the ability to pay a fine: "The defendant stated that he does not have any income and does not have any assets. He reported that he owes creditors but . . . has no idea [about] the amount. Based on the defendant's financial profile, it appears that he does not have the ability to pay a fine." (Id.) Neither the government nor Mr. Vigil objected to these portions of the PSR.

---

[7] Before reaching this issue, we had found that the district court improperly applied the Guidelines, and thus that the defendant's sentence must be reversed and remanded. Foote, 413 F.3d at 1251.

At the sentencing hearing, the district court initially stated that it was not going to impose a fine, but then immediately changed course and imposed a fine of $10,000. Although the district court did not give any explicit reasons for the fine, the record strongly suggests that the court felt that a fine was appropriate in light of the court's inability, because of the plea agreement, to impose the full restitution amount of $15,642.91 as called for by the PSR. The relevant portion of the sentencing-hearing transcript is useful in understanding the court's decision:

> THE COURT: Restitution is ordered in the amount of $15,642.91, with regular payments to begin immediately. Cabela's, $2,717; Best Buy, $3,918; Zions Bank, $7,455; and Wells Fargo Bank, $1,552. . . .
>
> [DEFENSE COUNSEL]: Your Honor, as outlined in our objection, our position is that given the convictions that were entered here, that the only restitution that can be ordered is the $2,717.19.
>
> . . .
>
> THE COURT: You didn't say anything about that today, Mr. Huber [AUSA]. What is your position on that?
>
> [AUSA]: Judge --
>
> THE COURT: I'm sorry. I'm at a loss here.
>
> [AUSA]: We did respond in the pleading and noted that we didn't have an adequate provision in our plea agreement to accommodate the other restitution.
>
> THE COURT: Is that what it boils down to, the plea agreement? Well, then with the acknowledgement of the government it is $2,717.19. $100 a month. That will be adjusted based on the probation officer's assessment of the defendant's ability to pay. I guess it is a plea agreement thing. People should pay back money they steal. That is apparently all that we have an agreement on. Does that tie my hands? Why would your plea agreement tie my hands?

22

[DEFENSE COUNSEL]: The statutes are set forth in my brief, Your Honor.

. . .

THE COURT: Okay. Has he waived his appeal rights?

[DEFENSE COUNSEL]: He has not.

THE COURT: You have ten days to take an appeal if you feel this sentence has been illegal or for any other reason you're planning to appeal to the Tenth Circuit Court of Appeals. A $300 special assessment fee is imposed pursuant to statute. <u>I'm not imposing a fine. No, wait, I am. A fine of $10,000.</u> Anything else, Mr. McMurray [DEFENSE COUNSEL]?

[DEFENSE COUNSEL]: Just to note an objection to the fine on the grounds that my client is indigent. That is all I want to note.

(<u>Id.</u> at 32-34 (emphasis added).)

The district court's imposition of the $10,000 fine must be reversed. Although the fine was well within the applicable Guideline range of $3,000 to $30,000, <u>see</u> U.S.S.G. § 5E1.2(c)(3), the record does not reflect "the district court's consideration of the pertinent factors prior to imposing the fine." <u>Washington-Williams</u>, 945 F.2d at 328. Specifically, despite the PSR's finding that Mr. Vigil did not appear to be able to pay a fine and the absence of any objection by the government to this finding, the district court did not address at all the issue of Mr. Vigil's ability to pay. Indeed, the district court did not provide <u>any</u> reasons for imposing the fine. In addition, the district court did not consider whether the imposition of the fine might impair Mr. Vigil's ability to pay the restitution ordered. Under these circumstances, the district court abused its discretion. See <u>Foote</u>, 413 F.3d at 1253; <u>Gonzalez</u>, 541 F.3d at 1256.

23

The government nonetheless argues that the fine was appropriate because Mr. Vigil's employment history, as described by the PSR, indicated that Mr. Vigil would be able to pay the fine in the future. In support, the government cites two cases—one published and one unpublished—finding that a defendant's present inability to pay does not foreclose the imposition of a fine where the defendant may be able to pay the fine in the future. See United States v. Platt, 97 F. App'x 851, 858 (10th Cir. 2004) (unpublished) ("The fact a defendant is indigent at the time of sentencing does not preclude a fine from being imposed."); United States v. Klein, 93 F.3d 698, 706 (10th Cir. 1996) ("[The defendant's] indigence at the time of sentencing did not preclude imposition of a fine."). However, in Platt we did not address whether or to what extent the district court considered the defendant's ability to pay, 97 F. App'x at 858-59, and in Klein, the district court specifically made findings regarding the defendant's employment history and earning capacity in finding that the defendant could pay the fine over time in the future, 93 F.3d at 705-06.

In this case, the district court did not indicate that it was basing the fine on Mr. Vigil's future ability to pay. Indeed, the district court did not provide any reasons supporting its implicit determination that Mr. Vigil was able to pay or would become able to pay a $10,000 fine. This constitutes an abuse of discretion, and we therefore reverse the court's imposition of the fine and remand for resentencing.

## CONCLUSION

For the reasons discussed above, we REVERSE the district court's application of the two-level enhancement under U.S.S.G. § 2B1.1(b)(4) and imposition of a $10,000 fine, VACATE Mr. Vigil's sentence, and REMAND for resentencing.