**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0015n.06

**No. 10-1597**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Jan 09, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff - Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| TOE MYINT, | ) | **OPINION** |
| | ) | |
| Defendant - Appellant. | ) | |

_____

Before:  BOGGS and WHITE, Circuit Judges; BERTELSMAN, District Judge.[*]

**HELENE N. WHITE, Circuit Judge.**  Defendant-Appellant Dr. Toe Myint was convicted of one count of conspiracy to commit health care fraud, 18 U.S.C. § 1349.  In this timely appeal, Myint challenges the sufficiency of the evidence and the district court's "deliberate ignorance" jury instruction.  He also claims ineffective assistance of counsel.  We **AFFIRM** Myint's conviction and **DISMISS WITHOUT PREJUDICE** his ineffective assistance of counsel claim.

**I.**

Dr. Myint was indicted on one count of conspiracy to defraud Medicare and three counts of defrauding Medicare, 18 U.S.C. §§ 1347, 1349, in connection with his work as a medical doctor at

---

[*]The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Sacred Hope Center, Inc. (Sacred Hope), a clinic in Southfield, Michigan, purporting to perform injection therapy.[1]

During the early summer of 2006, Jose Rosario met with his cousin, Lill Vargas-Arias, to discuss opening and managing a clinic in Detroit, Michigan for the purpose of defrauding Medicare by ordering expensive medications that patients did not need and administering only a fraction of the drugs billed to Medicare. Rosario told Vargas-Arias that Sacred Hope would recruit Medicare patients who would be paid to attend the clinic. One of Vargas-Arias's first and top priorities was to hire a doctor because Sacred Hope could not bill without a doctor's Medicare provider number. According to Vargas-Arias, Sacred Hope needed a doctor who "didn't ask a lot of questions," who "pretty much got along with whatever . . . [they] were going to do," and who would "actually go along with the scheme." Trial Tr. at 315-16, 429. The doctor's main role would be to sign charts and order medications. After placing an ad in the newspaper and rejecting several doctors because they expressed skepticism about Sacred Hope, Vargas-Arias interviewed Dr. Toe Myint.[2]

During their interview, Vargas-Arias explained to Dr. Myint that Martinez, an accountant from Florida, was opening Sacred Hope to provide infusion therapies for high-risk patients, such as patients with HIV or Hepatitis C. Vargas-Arias did not inform Dr. Myint that these patients would be paid, though she testified that she told Dr. Myint that the patients would come from soup kitchens

---

[1]The indictment also named ten other individuals: Daisy Martinez, Lill Vargas-Arias, Jose Rosario, Arnaldo Rosario, Terrence Hicks, Wayne Smith, Muhammad Al Mahdi, Victor Dozier, Louis Jackson, and John Saunders. Indictment, R.4.

[2]Dr. Myint came to the United States in 1999. He lived in Burma, now Myanmar, until 1990, when he fled because of political persecution. Dr. Myint came to the United States in 1999. He lived in Burma, now Myanmar, until 1990, when he fled because of political persecution.

and homeless shelters. Vargas-Arias said she hired Dr. Myint because "he agreed with everything" and, in her view, he would "do whatever's necessary" and could be "easily maneuvered." *Id.* at 320, 404. Dr. Myint signed a contract under which he would be paid $100 per hour for twelve hours per week and $500 per month toward his malpractice insurance. On September 20, 2006, Dr. Myint gave Vargas-Arias his Medicare provider number; Vargas-Arias submitted the Medicare enrollment application the same day, and Sacred Hope began seeing patients the next day. *Id.* at 327.

All the patients would arrive at Sacred Hope in the same van, and Vargas-Arias testified that Dr. Myint sometimes witnessed all the patients coming in at the same time. Rosario's nephew, Arnaldo Rosario, was responsible for recruiting patients and testified that payments to the patients and recruiters were secret. Vargas-Arias performed the patients' initial evaluations, asking questions about demographics and symptoms, as well as taking vital signs. Vargas-Arias explained that inflammatory problems, especially asthma, were preferable because those maladies were consistent with the drugs Sacred Hope was planning to bill anyway.

Dr. Myint's interaction with the patients was limited. A patient's initial visit with Dr. Myint lasted between fifteen and twenty minutes, but follow-up visits were "in and out." According to Vargas-Arias, Dr. Myint saw patients between thirty to thirty-five percent of the time; otherwise, he was in his office searching the internet or watching soccer. Some weeks, especially toward the end, Dr. Myint did not come into the clinic at all.

Many of the patients received infusions of vitamins, such as Vitamin C. Vargas-Arias testified that Dr. Myint prescribed these vitamin treatments three times per week. She also explained that there was no medical reason for providing the vitamins via infusion, as opposed to administering them orally. The vitamin infusions constituted fourteen percent of the claims that Sacred Hope

billed to Medicare. Most of the drugs Sacred Hope administered – and the most profitable – were Interferon, Acthar, Cosyntropin, and Carimune. Dr. Myint did not have prior experience with these drugs, so Vargas-Arias printed information from the internet and encouraged Dr. Myint to prescribe the medicines. In particular, she highlighted that some of the drugs could be used for asthma. Vargas-Arias also informed him that the other clinics, including the clinics in Florida, were using the medications. According to Vargas-Arias, Dr. Myint knew Sacred Hope had purchased some of the medicine. These four drugs constituted around eighty percent of Sacred Hope's claims to Medicare. The drugs – if they were administered at all – were diluted before they were administered to the patients. However, Medicare was billed as though the patients had received the full, undiluted doses. At trial, Dr. Myint stipulated that none of these drugs were medically necessary.

Vargas-Arias testified that Dr. Myint agreed to prescribe the medications. According to Vargas-Arias, Dr. Myint would initially scribble a few notes on a patient's treatment plan – such as "Start Acthar," or something comparably vague – that were not detailed enough to perpetrate the scheme. Then, Vargas-Arias would rewrite the notes, making the diagnoses appear more plausible. In doing so, she explained to Dr. Myint that she had "cleaned up" everything and made the notes make more sense. Dr. Myint apparently asked Vargas-Arias where she got the additional information, and she responded that she was researching and learning on the internet. Vargas-Arias testified that Dr. Myint knew she did not have any medical training.

Unbeknownst to Dr. Myint, another doctor from Florida assisted Vargas-Arias in rewriting the patient notes. Vargas-Arias testified that Dr. Myint would sign the notes *after* she had rewritten them. The government presented patient files on which Vargas-Arias's changes had forced Dr. Myint to sign in a different spot than usual, indicating that Vargas-Arias's additions had, in fact,

4

occurred before Dr. Myint signed. Dr. Myint signed the rewritten patient notes without objection and actually commented that she was becoming really good at transcribing the notes. At one point, Vargas-Arias bragged to a coconspirator that she could get Dr. Myint to sign anything she put in front of him.

On February 27, 2007, Wisconsin Physician Services and Trust Solutions, contractors responsible for processing Sacred Hope's claims, noted certain billing irregularities. For example, the drugs for which Sacred Hope billed were not related to the stated diagnoses or were prescribed in unusually high doses. On March 13, 2007, Trust Solutions notified Sacred Hope that its Medicare payments were suspended. Upon learning this, Vargas-Arias went to Dr. Myint and told him that there was likely going to be an investigation. In tears, Vargas-Arias asked Dr. Myint to sign back-dated patient forms, as well as blank forms, which he did.

Two FBI agents interviewed Dr. Myint on August 27, 2007. Agent Shammot testified that Dr. Myint admitted he signed the backdated and blank patient files that Vargas-Arias brought to him. Dr. Myint told the agents that Vargas-Arias had searched on the internet and suggested the medications that he should prescribe. Dr. Myint also said that although he did not believe in vitamin therapy, he ordered the vitamins because Vargas-Arias suggested it and he thought the therapy "wouldn't hurt." *Id.* at 526. According to Agent Shammot, Dr. Myint said he did not know the amount of medications that were being administered to the patients.[3]

---

[3]Vargas-Arias testified that patients would receive a diluted form of the treatments – if at all – so that, in the event of a Medicare investigation, the patients would have traces of the drugs in their system.

Agent Shammot testified that Dr. Myint initially admitted that he had prescribed steroid treatments for patients with asthma or breathing problems. The only two steroids for which Sacred Hope billed were Cosyntropin and Corticotropin.[4] Later in the interview, Dr. Myint recanted and stated that he had not prescribed Cosyntropin. Likewise, he denied having prescribed Interferon. Dr. Myint also misrepresented the amount of money Sacred Hope paid him, stating that he only earned $70 per hour and received only $700 in bonuses.

The government also introduced two statements Dr. Myint made in the course of the investigation of Sacred Hope. First, in response to a Department of Human and Health Services audit, Dr. Myint made the following statement:

> I, Dr. Toe Myint work for Sacred Hope for part-time basis only at $80 per hour. I examine patients and Sacred Hope did the billing. I do not get involved with the amount billed. The most I did would be 99205 for a new patient and 99212 for a revisit examinations. I became suspicious of the activities and quit in 2007, started in 2006. [sic]

These statements were inaccurate since Dr. Myint earned more money and did not quit Sacred Hope.

Additionally, Dr. Myint sent a Department of Justice attorney an email that contained the following:

> On 9-11-2007 when I went to FBI in Troy, Michigan, I said, quote, I signed the progress note, unquote, mean they were seen by me at Sacred Hope Center. I never ordered Cosyntropin infusion. There was no patient who had the slightest medication – indication they needed Cosyntropin. I do not approve Cosyntropin as therapeutic medication. [sic]

In that same email, Dr. Myint stated that he earned $100 per hour at Sacred Hope. *Id*. at 2.

---

[4]Corticotropin is sold under the brand name Acthar. Hence, it was one of the four main drugs administered at Sacred Hope.

Dr. Myint did not testify at trial.[5] In his defense, Dr. Myint called Luz Perez, one of the medical assistants at Sacred Hope. She explained that she administered the infusions to the patients and that, although she talked to the patients, she did not know the patients were paid to attend the clinic. She also testified that Dr. Myint was careful about prescribing medications to the patients. Although Dr. Myint never told her to give the medications – Vargas-Arias did that – Perez also testified she would not have given the medications unless she thought Dr. Myint approved them.

After a three-day trial, the jury convicted Dr. Myint of one count of conspiracy to defraud Medicare, but acquitted him of three counts of Medicare fraud. 18 U.S.C. §§ 1347, 1349. The district court sentenced Dr. Myint to six years' imprisonment on April 29, 2010. On June 16, 2010, nearly five months after the trial, Dr. Myint moved for a new trial. *See* Fed. R. Crim. P. 33. The district court denied the motion because it was untimely. This appeal followed.

**II**.

**A.**

In reviewing challenges to the sufficiency of the evidence, this court considers the evidence in the light most favorable to the government and upholds the conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Davis*, 577 F.3d 660, 671 (6th Cir. 2009). Dr. Myint concedes that he did not move for acquittal pursuant to Federal Rule of Criminal Procedure 29 during the trial.[6] Additionally, his motion for a

---

[5]Apparently, Dr. Myint initially intended to testify on his own behalf. Trial Tr. at 496. The decision not to have him testify was made ten minutes before the defense was slated to present its case. *Id.* at 587.

[6]Dr. Myint's counsel made this choice deliberately. During a sidebar conference, the district court pointed out to Dr. Myint's counsel that he had not made a Rule 29 motion. Defense counsel responded that such a motion would have been "frivolous."

new trial was untimely.[7]  His conviction will therefore be upheld unless doing so would result in a "manifest miscarriage of justice."  *See United States v. Price*, 134 F.3d 340, 349 (6th Cir. 1998) (applying manifest-miscarriage-of-justice standard of review when defendant did not move for judgment of acquittal); *cf. United States v. Kuehne*, 547 F.3d 667, 693 (6th Cir. 2008) (rejecting untimely appeal even when defendant claimed ineffective assistance of counsel).  A manifest miscarriage of justice "exists only if the record is devoid of evidence pointing to guilt."  *United States v. Williams*, 641 F.3d 758, 767 (6th Cir. 2011) (quoting *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998)).

Dr. Myint was convicted of a single count of conspiracy to commit health care fraud.  18 U.S.C. § 1349 provides:

> Any person who attempts or conspires to commit any offense under this chapter [18 USCS §§ 1341 et seq.] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

*See also* 18 U.S.C. § 1347.  "A conspiracy charge requires the Government to prove an agreement between two or more persons to act together in committing an offense, and an overt act in furtherance of the conspiracy."  *United States v. Hunt*, 521 F.3d 636, 647 (6th Cir. 2008) (citations and internal quotation marks omitted); *United States v. Crossley*, 224 F.3d 847, 856 (6th Cir. 2000)

---

Trial Tr. at 588.  The district could apparently agreed, explaining that he would have denied any such motion because "although there may be no direct evidence, there's plenty of circumstantial evidence."  *Id.* at 588-89.

[7]Dr. Myint's motion for a new trial was filed well beyond the fourteen-day period of Rule 33, and the district court denied Dr. Myint's motion for this reason.  Order Denying Defendant's Motion for New Trial, R.237; *see also* Fed. R. Crim. P. 33(b)(2).  Dr. Myint does not seriously argue that any exception to the fourteen-day period applies.  Fed. R. Crim. P. 45(b)(1); *see generally United States v. Owen*, 559 F.3d 82, 83 (2d. Cir. 2009).

(same).[8]  The agreement need not be formal; a "tacit or mutual understanding" will suffice. *Crossley*, 224 F.3d at 856.  And the government need not prove that Myint knew every detail of the conspiracy – only that the defendant knew the object of the conspiracy and voluntarily associated himself with the conspiracy to further its objective. *Id*.

Dr. Myint asserts that there was no evidence that he knowingly participated or voluntarily joined in the conspiracy with the intent to defraud Medicare.  Specifically, Dr. Myint argues that the evidence showed that: (1) he was not involved in the billing process; (2) he never knew that the patients were being paid to attend Sacred Hope; (3) he did not know the actual amount of the medications administered to the patients; (4) Vargas-Arias intended to keep him ignorant of the scheme; (5) the clinic's workers, including Vargas-Arias, spoke to each other in Spanish; and (6) the owners were forced to have a doctor from Florida rewrite the patient files in order to make them appear more plausible.  From this, Dr. Myint submits that he was the "perfect dupe who fell into a trap set by others to defraud Medicare."  Appellant's Br. at 32.

Here, the central question is whether Dr. Myint knew the essential purpose of the conspiracy and voluntarily associated himself with it.  Importantly, direct evidence of the defendant's knowledge of the conspiracy is not necessary.  A conspiracy conviction can be supported by circumstantial evidence that a reasonable person could interpret as showing knowledge of the

---

[8]Dr. Myint argues that there is a meaningful distinction between the requirements for a conspiracy conviction under § 1349 and a separate conspiracy statute, 18 U.S.C. § 371.  Appellant's Br. at 26.  The government concedes, however, that it must demonstrate that Dr. Myint knowingly and voluntarily joined and participated in an agreement to defraud Medicare and that Dr. Myint knew of the central purpose of the scheme – to defraud Medicare.  Appellee's Br. at 30.

essential purpose of the conspiracy and participation in the conspiracy. *Hunt*, 521 F.3d at 647 (citations and internal quotation marks omitted); *United States v. Sliwo*, 620 F.3d 630, 633.

Despite Dr. Myint's arguments to the contrary, the government did submit evidence that Dr. Myint knew the object of the conspiracy and voluntarily associated himself with it. The government presented testimony – from witnesses who worked at Sacred Hope alongside Dr. Myint, as well as an FBI agent who testified about statements Dr. Myint made during the course of the investigation – that established the following: Dr. Myint knew that Sacred Hope was billing Medicare and he signed forms stating clearly that he would be responsible for any Medicare claims submitted under his provider number; Dr. Myint ordered vitamin infusions three times per week, despite the fact that Dr. Myint did not believe in vitamin infusions; when he discussed Sacred Hope with the FBI, Dr. Myint initially admitted to ordering steroids for the patients at Sacred Hope, which he also admitted were not medically necessary; Dr. Myint signed forms after they had been significantly modified by Vargas-Arias, knowing that Vargas had no medical training; Dr. Myint knew that Sacred Hope had ordered some of the medications; Dr. Myint signed backdated and blank patient forms; and throughout the course of the investigation, Dr. Myint attempted to obscure his role at Sacred Hope. The government presented evidence from which a reasonable jury could infer that Dr. Myint tacitly agreed to assist Sacred Hope in submitting claims to Medicare knowing the treatments were medically unnecessary.[9]

---

[9]Dr. Myint argues in his reply brief that the government may not rely on any circumstantial evidence after the conspiracy had been terminated, such as the statements made by Dr. Myint to government officials and evidence showing that Dr. Myint signed backdated forms. Dr. Myint relies on *United States v. Jimenez Recio*, 537 U.S. 270 (2003). *Jimenez Recio*, however, holds that a conspiracy does not automatically terminate when the government defeats the object of the conspiracy and does not answer the question whether the government may rely on evidence obtained after the conspiracy

Dr. Myint contends vigorously that the others at Sacred Hope purposely kept him in the dark.[10]  Perhaps this is true.  But an equally plausible explanation – and the one the jury apparently believed – is that Dr. Myint voluntarily joined the conspiracy knowing the essential purpose.  When two views of the evidence are reasonable, this court may not substitute its judgment for that of the jury.  *See Davis*, 577 F.3d at 671.

**B.**

Dr. Myint next attacks the jury's verdict on the conspiracy charge because it is inconsistent with his acquittal on the health care fraud charges.  This court has held that "inconsistent verdicts are generally held not to be reviewable," in part because "[a] jury that inconsistently convicts the defendant of one offense and acquits him of another is as likely to have erred in acquitting him of the one as in convicting him of the other."  *United States v. Lawrence*, 555 F.3d 254, 261-62 (6th Cir. 2009) (citation and internal quotation marks omitted); *accord United States v. Espinoza*, 338 F.3d 1140, 1147 (10th Cir. 2003).  Hence, inconsistent verdicts are only overturned when they are the result of "arbitrariness or irrationality."  *Lawrence*, 555 F.3d at 263.

The jury's verdicts do not necessarily conflict with one another.  Each of the three individual counts of Medicare fraud relates to an incident in which Dr. Myint allegedly prescribed specific quantities of medications for three specific individuals.  The government provided very little – if any

is terminated.  *Id.* at 274-75.

[10]In his reply brief, Dr. Myint makes an additional argument involving the definitions of culpability set forth in the Model Penal Code.  Appellant's Reply Br. at 12-14.  Because this argument was advanced for the first time in his reply brief, we do not address it.  *See Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("An argument raised for the first time in a reply brief will not be considered by this Court.").

– testimony or evidence related to these specific incidents, and the jury may have acquitted Dr. Myint on the substantive charges because the government simply had not proved beyond a reasonable doubt that Dr. Myint acted on these occasions. *See generally United States v. Chen*, 378 F.3d 151 (2d Cir. 2004) (upholding "inconsistent" verdicts when charges underlying conspiracy related to specific incidents). Dr. Myint also submits the jury's verdicts are the result of irrationality, but he cites no persuasive support for such a proposition. Accordingly, we will not disturb the jury's decision based on a potential incongruity between the verdicts.

**III.**

Dr. Myint contends that the district court committed reversible error by giving the jury a deliberate-ignorance instruction. Joint Proposed Jury Instructions at 17, R.158; *see also* Sixth Circuit Pattern Criminal Jury Instructions § 2.09 (West 1991). In response, the government, advances the invited-error doctrine, which bars appellate consideration of alleged errors that a party invited. *United States v. Budd*, 496 F.3d 517, 529 (6th Cir. 2007) (refusing to entertain objection to jury instructions after trial counsel indicated he was "comfortable"). Invited error does not apply, however, "when the interests of justice demand otherwise." *See United States v. Savoires*, 430 F.3d 376, 381 (6th Cir. 2005) (quoting *United States v. Barrow*, 118 F.3d 482, 491 (6th Cir. 1997)). *Savoires* stands for the proposition that if the government was equally at fault in inviting the error, the interests of justice are not served by applying the doctrine strictly. Here, the government submitted the jury instructions jointly with Dr. Myint, and thus we will review the instruction.

Because Dr. Myint did not object to the instruction at trial, however, we apply plain-error review. *United States v. Stover*, 474 F.3d 904, 913 (6th Cir. 2007). Under the plain-error standard, this court corrects an error if the appellant demonstrates that: "(1) there is an 'error'; (2) the error

12

is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Carradine*, 621 F.3d 575, 579 (6th Cir.) (quoting *United States v. Marcus*, 560 U.S. --, 130 S. Ct. 2159, 2164 (2010)).

This court has approved the deliberate-ignorance instruction in conspiracy cases in assessing the defendant's knowledge of the unlawful aims of the conspiracy. *See United States v. Williams*, 612 F.3d 500, 507 (6th Cir. 2010) (upholding deliberate-ignorance instruction to show degree of knowledge concerning illegality of defendant's actions); *United States v. Warshawsky*, 20 F.3d 204, 211 (6th Cir. 1994), *superseded on other grounds as stated in United States v. Vigil*, 644 F.3d 1114 (10th Cir. 2011). Dr. Myint argues that the deliberate-ignorance instruction is proper so long as there is *some* evidence supporting a deliberate-ignorance theory of guilt, and here, there is no such evidence. In the alternative, Dr. Myint argues that the instruction was improperly given here because it was used to prove that Dr. Myint voluntarily and knowingly agreed to conspire*, not* to establish that he had knowledge of the unlawful aims of the conspiracy.

Dr. Myint's arguments miss the mark. First, this court has squarely rejected Dr. Myint's first argument: "when a district court gives a deliberate ignorance instruction that does not misstate the law but is unsupported by sufficient evidence, it is, at most, *harmless error*." *United States v. Beaty*, 245 F.3d 617, 622 (6th Cir. 2001) (emphasis added) (quoting *United States v. Mari*, 47 F.3d 782 (6th Cir. 1995)); *see also United States v. Pulley*, 403 F. App'x. 9, 11 (6th Cir. 2010). And Dr. Myint's second argument is belied by the instructions themselves, which expressly pertain to Dr. Myint's knowledge only. The district court instructed the jury as follows:

13

(1) Next, I want to explain something about proving a defendant's knowledge.

(2) No one can avoid responsibility for a crime by deliberately ignoring the obvious. If you are convinced that the defendant deliberately ignored a high probability that Sacred Hope Center was ordering medications for patients that were not medically necessary then you may find that he knew Sacred Hope Center was ordering medications for patients that were not medically necessary.

(3) But to find this, you must be convinced beyond a reasonable doubt that the defendant was aware of a high probability that Sacred Hope Center was ordering medications for patients that were not medically necessary, and that the defendant deliberately closed his eyes to what was obvious. Carelessness, or negligence, or foolishness on his part is not the same as knowledge, and is not enough to convict. This, of course, is all for you to decide.

(4) Likewise, if you are convinced that the defendant deliberately ignored a high probability that Sacred Hope Center was not providing the medications to patients as billed to Medicare then you may find that the defendant knew that Sacred Hope Center was not providing medications to patients as billed to Medicare.

(5) But to find this, you must be convinced beyond a reasonable doubt that the defendant was aware of a high probability that Sacred Hope Center was not providing the medications to patients as billed to Medicare, and that the defendant deliberately closed his eyes to what was obvious. Carelessness, or negligence, or foolishness on his part is not the same as knowledge, and is not enough to convict. This, of course, is all for you to decide.

The jury instruction begins explicitly by noting that it only pertains to knowledge. Further, the instruction only allows the jury to find two facts: (1) that Dr. Myint *knew* that Sacred Hope was ordering medications that were not medically necessary; and (2) that Dr. Myint *knew* that Sacred Hope was not providing medications as prescribed. The jury instruction thus went specifically to Dr. Myint's knowledge that Sacred Hope was committing health care fraud, the essential – and illegal – purpose of the conspiracy. The instructions were not used, as Dr. Myint suggests, to demonstrate that he voluntarily joined the conspiracy.[11]

---

[11]As in *Williams*, the district court also instructed the jury in a separate instruction that the government must prove that Dr. Myint *voluntarily joined* the conspiracy and that

14

Dr. Myint's objections to the jury instructions are therefore unavailing. At the very least, the jury instruction is "subject to reasonable dispute," *Carradine*, 621 F.3d at 579, and, accordingly, Dr. Myint has not shown that the district court committed plain error in its charge to the jury.

**IV.**

This leaves Dr. Myint's argument that his trial counsel was ineffective, depriving him of his Sixth Amendment right to assistance of counsel.[12] This court reviews ineffective assistance of counsel claims de novo. *United States v. Jackson*, 181 F.3d 740, 744 (6th Cir. 1999). There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 688-89 (1984). Dr. Myint asserts that counsel

---

he *knew* the conspiracy's main purpose. 612 F.3d at 507-08. The district court instructed the jury on these points as follows:
> (1) If you are convinced that there was a criminal agreement, then you must decide whether the government has proved that the defendant knowingly and voluntarily joined that agreement. To convict the defendant, the government must prove that he knew the conspiracy's main purpose, and that he voluntarily joined it intending to help advance or achieve its goals. . . .
> (4) What the government must prove is that a defendant knew the conspiracy's main purpose, and that he voluntarily joined it intending to help advance or achieve its goals. This is essential.
> (5) A defendant's knowledge can be proved indirectly by facts and circumstances which lead to a conclusion that he knew the conspiracy's main purpose. But it is up to the government to convince you that such facts and circumstances existed in this particular case.

Joint Proposed Jury Instructions at 21, R.158.

[12]The Sixth Amendment provides, in relevant part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

was ineffective in failing to call Dr. Myint as a witness on his own behalf, and in stipulating that the medications were medically unnecessary.[13]  Appellant's Br. at 44.

Generally, ineffective assistance of counsel claims are not reviewed on direct appeal and are instead raised in a post-conviction proceeding under 28 U.S.C. § 2255, "except in rare circumstances where the error is apparent from the existing record.*" United States v. Wells*, 623 F.3d 332, 347-48 (6th Cir. 2010) (quoting *United States v. Lopez-Medina*, 461 F.3d 724, 737 (6th Cir. 2006)).  The Supreme Court has cautioned that an appellate court "may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse." *Massaro v. United States*, 538 U.S. 500, 505 (2003). The record here is inadequate to determine on direct appeal whether Dr. Myint received ineffective assistance of counsel.

## V.

For the foregoing reasons, we **AFFIRM** Dr. Myint's conviction.  We also **DISMISS WITHOUT PREJUDICE** Dr. Myint's ineffective assistance of counsel claim.

---

[13]Dr. Myint argues in his reply brief that there are other instances when his counsel's performance was deficient.  Specifically, Dr. Myint points to trial counsel's failing to make a motion for judgment of acquittal, failing to make a timely motion for a new trial, and agreeing with the government's deliberate ignorance instruction. Appellant's Reply Br. at 18.